No. 68,460

VERA NADINE MCKISSICK, *Appellee*, v. ANDREA S. FRYE,
*Appellant*.

(876 P.2d 1371)

Opinion filed June 3, 1994.

*John A. Bausch*, of Benfer & Bausch,P.A., of Topeka, argued the cause and was on the briefs for appellant.

*Pedro L. Irigonegaray*, of Irigonegaray & Associates, of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Plaintiff filed an action for injuries suffered in an automobile collision. The jury apportioned the fault at 20% to plaintiff and 80% to defendant and awarded $125,388.12 after adjustment for comparative fault. Defendant appealed to the Court of Appeals. In an unpublished opinion it affirmed the trial court, except the award to plaintiff of $30,000 for future medical expenses. The Court of Appeals found that there was not sufficient evidence to support the jury's award for future medical ex-

penses. This court granted plaintiff's petition and defendant's cross-petition for review of the Court of Appeals decision. Defendant claims that the district court erred in: (1) allowing plaintiff to testify as to her lack of funds to seek medical treatment; (2) admitting prejudicial testimony; (3) admitting medical testimony without a foundation; and (4) allowing plaintiff's attorney to refer to insurance; defendant further claims the verdict was excessive. Plaintiff claims that the Court of Appeals improperly set aside the jury's award of future medical expenses.

Nadine McKissick was driving north on U.S. Highway 75 near Lyndon when Andrea Frye, who was southbound, drove her vehicle left of center and struck McKissick's automobile head-on. McKissick suffered injuries for which she subsequently filed this action. She claimed damages for past medical expenses of $9,624.15, unknown future medical expenses, past physical pain and suffering of $150,000, future pain and suffering of $200,000, and lost income of $28,805. Frye challenged McKissick's claimed damages and denied any negligence; in the alternative, she claimed McKissick was comparatively negligent.

McKissick had just entered onto Highway 75. The road was slick. She maintained a slow speed due to the weather conditions. She saw two cars approaching. McKissick did not see Frye's car pull into her lane or remember the collision. McKissick suffered a mild concussion, multiple contusions, abrasions, and broken skin on the left side of her forehead and scalp. She had severe neck pain that radiated down through her upper back. Her ankle was swollen and discolored.

Dr. Hornbaker, who specialized in internal medicine, was McKissick's physician. Dr. Hornbaker treated her for injuries resulting from the accident. All x-rays were negative. Dr. Hornbaker diagnosed that McKissick had suffered a "necklature sprain" and a strained ankle. McKissick continued to have problems with her ankle. A bone scan was completed approximately two months after the accident. The bone scan showed there was an abnormal uptake in one of her ankle bones which appeared to be a "reflex sympathetic dystrophy," an injury to the sympathetic nerve system that causes pain. Dr. Hornbaker described several methods of

treatment. One of the treatments was a sympathetic block, where a local anesthetic is injected into the nerves to offer temporary relief.

Dr. Hornbaker first referred McKissick to Dr. Patel, a neurologist. The results of Dr. Patel's x-rays of the skull, the brain scan, and other tests were normal. Dr. Hornbaker then referred McKissick to Dr. Knappenberger, an orthopedic specialist, for pain in her right leg and ankle. Dr. Knappenberger noted that McKissick's ankle was swollen and she had a marked hypersensitivity to touching around the inner aspect of her ankle. He reviewed her x-rays and felt she had a "very minimal nondisplaced evulsion fracture on the lateral aspect of her foot," sometimes referred to as a chip fracture, which normally heals without incident. The chip fracture was on the outer side of her ankle, while the tenderness was on the inner side. The sensitivity was not consonant with the x-ray findings.

Dr. Knappenberger recommended that McKissick wear an air cast on her ankle and try to walk on it as much as possible, and he prescribed medication for the pain. When Dr. Knappenberger saw McKissick a month later, she appeared to be walking a little better. The treatment continued for another month, more improvement was noted, and the doctor decided to cut back on the medication dosage. McKissick, without the doctor's recommendation, began wearing an elastic ankle support rather than the air cast. He continued to see her, and she continued to complain of the same level of pain five months after the accident. Knappenberger last saw McKissick in July 1990 and told her that if she had any other problems to call him back. At the time of the deposition, February 1992, he had not had any calls from McKissick reporting any medical problems.

While Dr. Knappenberger was treating McKissick, Dr. Patel referred McKissick to Dr. Wright, a chiropractor, for problems in her neck, shoulders, lower back, and right ankle. Dr. Wright diagnosed her with "cervical myoligamentous strain, cervical intersegmental dysfunction, muscle tension, headaches and closed head trauma." Dr. Wright also treated her ankle problem. Dr. Wright testified the cause of McKissick's pain was myofascitis,

which is an inflammation of the nerve. Dr. Wright testified McKissick would need care for the rest of her life for her ankle pain. On cross-examination, Dr. Wright admitted that at the initial office visit no diagnosis of an ankle problem was made. Although Dr. Wright claimed he treated her ankle as a secondary consideration to her other complaints and he remembered her ankle as being swollen every time she visited him (90 times over a period from April 1990 to January 1992), no notations were made in Dr. Wright's office records regarding the ankle.

Frye, the defendant, was called as a witness in the plaintiff's case in chief. Frye testified she had gone to Manhattan with her boyfriend, Travis Allen, to attend a high school basketball game. Instead they spent the night before the accident at a motel in Manhattan. Her boyfriend had to be back at school by noon the next day in Fort Scott. She did not know how fast she was going on Highway 75, but she had slowed to approximately 35-40 miles per hour behind another car. When she decided to pass that car, Frye checked the road ahead and saw it was clear. After she pulled into the other lane to pass the slow moving car, McKissick's car "came flying over the hill" at about 65-70 miles per hour. Frye stated she was unable to pull back behind the other car, her car hit a patch of ice, she lost control of her vehicle, and it collided with McKissick's car.

Allen was the first witness for the defense. On cross-examination, plaintiff's counsel asked if Allen's parents knew he and Frye would be spending the night together in Manhattan the night before the accident. Allen answered they were aware of those plans. Allen's mother had called his school to inform them Allen would not be at school until noon.

Dr. Gendel, who had examined McKissick for the defense, testified he found no sympathetic dystrophy. Dr. Gendel testified that in his medical experience dating back to World War II, he had never seen a case of sympathetic dystrophy occurring in a lower extremity. Dr. Gendel stated when he examined her in August 1991 he found no abnormalities in her ankle. He opined McKissick did not require the chiropractic treatment she was receiving.

The jury found Frye 80% and McKissick 20% at fault. The jury awarded McKissick $65,000 for noneconomic damages (pain and suffering) to the date of the trial, $20,000 for future noneconomic loss (pain and suffering), $9,735.15 for past medical expenses, $30,000 for future medical expenses, $12,000 for economic damages to the date of the trial, and $20,000 for future economic loss (loss of income). The noneconomic damages totaled $85,000 for pain and suffering. The total damages, $156,735.15, was reduced by the comparative fault percentage to a net award of $125,388.12.

Frye appealed. The Court of Appeals, in an unpublished opinion, found: Plaintiff's attorney's references to insurance in voir dire were not reversible error, McKissick's testimony that she could not afford medical treatment did not reach the level of reversible error, and the testimony that Frye spent the night prior to the accident in a motel was not materially prejudicial. The Court of Appeals noted Frye failed to object when the procedure of sympathectomy was discussed in closing argument by plaintiff's counsel. It found this precluded appellate review of the admissibility of testimony regarding the procedure. The Court of Appeals commented that when the rule in *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973) (cumulative effect of misconduct by counsel can require reversal), was applied, it was a close call, but refused to reverse. The Court of Appeals then addressed Frye's challenge to the damage award. The Court of Appeals affirmed all the damages awarded by the jury except for future medical expenses. The Court of Appeals determined that the testimony of the chiropractor as to future medical expenses was insufficient to support an award of $30,000 for future medical treatment and reversed the jury's award of $30,000 for future medical expenses. We granted plaintiff's petition and defendant's cross-petition for review.

### Admissibility of McKissick's Economic Status

On direct examination, plaintiff's counsel asked McKissick why she did not try a biofeedback treatment recommended by a doctor at the Menninger Clinic. Defense counsel objected to the form

of the question. The district judge overruled the objection. McKissick answered, "I have no health insurance. I have doctor bills up to here. (Witness indicating.) And I have no money." Following a series of questions concerning McKissick's current daily regimen, this exchange took place after plaintiff's counsel asked McKissick why she could not do much of anything:

"A. Well, I can't get up and fix a meal. I can't run the vacuum very well. I can't stand on my feet. I sit and cry most of the time.

"Q. What do you sit and cry about?

"A. Because I don't know what's going to become of me.

"Q. What do you mean you don't know what's going to become of you?

"A. I'm sorry?

"Q. That's all right. Why don't you tell us what you mean by that? What is it that you mean when you say you don't know what's going to become of you?"

Defense counsel objected, claiming that the question was speculative. The court overruled the objection. McKissick responded, "I can't work and I have no money." McKissick then stated that she was unable to purchase another car.

Claiming plaintiff's counsel had allegedly opened the door of McKissick's financial condition on direct examination, defense counsel attempted to cross-examine McKissick as to her automobile insurance, her medical benefits, benefits for loss of wages of $2,100, and the fact she received an insurance check for $9,300. Defense counsel argued that he should be able to rebut on cross-examination McKissick's statement that she had no money. Defendant's counsel informed the court that McKissick had received $6,600 for lost wages and medical expenses under her no-fault insurance coverage, and $9,300 for replacement of her car. The court ruled that the defense could not inquire about the medical care reimbursement but could ask about the reimbursement for the damaged automobile. When cross-examined, McKissick testified the $9,300 she received from the insurance plus an additional $1,000 was required to pay off the balance of the loan on her wrecked car.

Frye asserts it was error to allow plaintiff to testify she did not have funds to obtain medical treatment such as sympathetic block and biofeedback. She begins her argument by citing the cases

consolidated in *Masson v. Kansas City Power & Light Co.,* 7 Kan. App. 2d 344, 642 P.2d 113, *rev. denied* 231 Kan. 801 (1982). Frye admits these cases were condemnation proceedings but points out the authority relied on by the *Masson* court was an automobile negligence case from California, *Hoffman v. Brandt,* 65 Cal. 2d 549, 552-53, 55 Cal. Rptr. 417, 421 P.2d 425 (1967). Frye asserts that because McKissick "obviously had insurance for medical and wage loss those statements [regarding her economic status] were false and an obvious appeal to sympathy and prejudice." McKissick argues both *Masson* and *Hoffman* can be distinguished because the attorney conduct in those cases was clearly out of line and is not comparable to what occurred in this case.

*Masson* was a consolidated appeal by a public utility from jury verdicts in two separate condemnation proceedings. Kansas City Power and Light Company (KCP&L) had acquired a 160-foot easement across a rural tract for a 345 KV overhead transmission line. The primary issue in each case was whether the fear of high voltage transmission lines could be used to compute damages for the taking of an easement for a high power line. A secondary issue in *Masson* was whether plaintiffs' counsel had improperly argued irrelevant matters to the jury.

In *Masson,* there was a consistent effort by the landowners to inform the jury of the impact that the easement would have on the personal lives of the landowners as opposed to its impact on the market value of their land. This effort was epitomized by the extensive testimony of Mr. and Mrs. Masson on their personal fear of electricity and the unknown dangers from high voltage lines after reading a magazine article and seeing a television movie on the dangers of electrical smog. Mr. Masson described going out along the easement with "neon" light bulbs and seeing the bulbs glow as a scary experience and said he worried about the possibility of contracting leukemia. Mrs. Masson thought $30,000 in damages was not enough because she would have to either live with the danger or move.

The utility's expert had assessed damages at $4,150, but the plaintiffs' expert set damages at $30,640. The jury verdict was $30,640, the exact amount requested by the plaintiffs. The Court

of Appeals observed that the impact of this testimony on the jury was "apparent." 7 Kan. App. 2d at 346. It noted that in an affidavit attached to the utility's motion for new trial, a juror was reported to have said that the jury asked the bailiff whether it could assess punitive damages. The *Masson* court asserted that if this was true, it demonstrated the passion and prejudice which resulted in the size of the verdict. It opined, "The evidence, once in, provided a steppingstone to the landowners' closing arguments designed to appeal to the sympathy of the jury. 7 Kan. App. 2d at 346. In *Masson,* there was "a good deal of evidence and argument on the themes of 'small individual versus big business' and 'punish the utility for its conduct.' " 7 Kan. App. 2d at 346. The impropriety of the admission of this evidence and of statements made in plaintiffs' closing argument were discussed in analysis of the consolidated case involving the other plaintiffs, the Freys.

In that case, the plaintiffs' trial strategy was to depict the Freys as helpless individuals fighting a rich and ruthless utility which needed to be penalized for its wrongful conduct in taking an easement which the landowners did not wish to sell and in the manner of the taking. The Court of Appeals noted that KCP&L, fresh from trying the *Masson* case, attempted to forestall the approach taken in the *Frey* case by filing a motion in limine. The motion sought to preclude counsel during voir dire from, among other things, making the individual versus corporation argument or suggesting that there was some impropriety in the taking. The trial court declined to rule on the motion but indicated that the voir dire would not be argumentative.

The landowners' attorney asked the jury if, as a result of seeing the movie "Ohms" or reading the Reader's Digest article, both of which had stressed the dangers of power lines, any juror had "a preconceived bias that Kansas City Power & Light should be penalized more than the evidence supports." 7 Kan. App. 2d at 347. The Court of Appeals noted that while ostensibly designed to discover bias, the question clearly planted the idea that the condemnor should be penalized for its conduct and there would be evidence as to how much the penalty should be.

In closing argument the theme was amplified in two ways. First, after referring to the absence of testimony from KCP&L's experts

about people building next to existing power line easements, counsel commented on the utility's wealth: "Believe me with the size and the money behind Kansas City Power and Light in preparing this case, if it had been there you would have heard it." 7 Kan. App. 2d at 347. Later, after argument from the utility attacking the landowner's value figures, counsel complained to the jury, stating:

" 'I'm almost over. You know trying a condemnation case against Kansas City Power and Light is an unbelievable experience and I have just witnessed it. The figures I have given are incorrect, pictures are not exchanged but introduced, and then *don't worry about fighting big business*, but if you give that twenty-five thousand two hundred dollars it's going to increase operating costs and we are going to slip it right to the rate payers, and I don't really think they want me to get into the justice of their rates, but that's what they would like you to do today.' " (Emphasis in original.) 7 Kan. App. 2d at 347-48.

The Court of Appeals noted that the wrongfulness of both the taking and the procedure was injected in comments about the fact that the utility, under the easement taken, had the right to erect two more towers at some later time. Counsel argued:

" 'There is no mystery involved with the location of these poles. It's just kind of like saying, Ed we got you twice, we'll put two of them up and we won't tell you where the other two are going. Now you go ahead and use your property, and you go ahead and sell, but when the buyer wants to know where are those other two towers going to be, I'm not going to tell you yet. You go ahead and develop and run your roads and build your houses, then we are going to tell you where we are going to put it. *Is that justice?* Do you think the engineers can't tell these men now, or do you think they can't tell them now if we need to do it again and we will condemn again and pay you for it, *so we don't rape you twice?* No, we don't do it that way. *Is that justice?*' " 7 Kan. App. 2d at 348.

And finally, counsel reached his peroration:

" 'The case is over now and I have about two minutes and I will sit down and you will get to do into round six. He doesn't get to go with you, this man who has had that place for seventy [sic] years of his life and he and his family for forty, and after your verdict hopefully this evening Mr. White and Mr. Murray can go to a new case, and Mr. Forbes can go to a new case, and Mr. Forbes can go back to Kansas City Power and Light, and I will try another lawsuit, and the twelve of you are going twelve different ways in life, *but you will have done that one American duty and sent a message to a utility that you are not going*

*to put up with the kind of treatment of your citizens,* you have got a chance to be heard that an individual never has.'" 7 Kan. App. 2d at 348.

This statement to the jury was clearly improper. The Court of Appeals noted that a condemnation trial is a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner. In striking that balance, there is no room for appeals to prejudice against the condemnor or sympathy for the landowner. Neither the relative financial positions of the parties nor the landowners' unwillingness to sell is relevant to the issue of values and damages. 7 Kan. App. 2d at 348-49.

In *Hoffman v. Brandt,* 65 Cal. 2d 549, the plaintiff, a 20-year-old woman who drove a Porsche, sued a 69-year-old retired machinist who drove a Rambler, for injuries sustained when their vehicles collided. Defense counsel, in closing, argued that the damages plaintiff requested would put the defendant in the county poor home. Defendant's counsel then rhetorically asked the jury, "[A]re you going to, by your verdict, say to [the defendant], 'It's Laguna Honda Home [a city/county home for the indigent] for you, Mr. Brandt?'" 65 Cal. 2d at 551. The plaintiff objected. Counsel briefly argued the issue in front of the jury. The trial court asked counsel to make any legal arguments outside the presence of the jury and sustained the objection. The trial judge admonished the jury to treat defense counsel's comments as argument, not evidence. 65 Cal. 2d at 551-52.

The California appellate court reversed, noting that the argument was clearly error. It stated that justice is to be accorded to rich and poor alike, and a deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case. 65 Cal. 2d at 552-53.

In *Masson,* counsel for the plaintiffs deliberately injected the improper argument into the proceedings. "[W]hen the jury went to the jury room almost the last phrase in its ears was a call to patriotic duty to 'send a message' to the utility that its reprehensible manner of dealing with landowners would not go un-

punished. It had no intimation from the court that its duty was otherwise." 7 Kan. App. 2d at 351-52. See also *Surface v. Douglas*, 1 Kan. App. 78, 83, 41 Pac. 207 (1895) (plaintiff's counsel, in closing, referred to plaintiff as a "poor, sick woman" with children to raise; no evidence adduced regarding financial or physical condition of plaintiff; remarks were outside of evidence and prejudicial). But see *Stotts v. Taylor*, 130 Kan. 158, 162, 285 Pac. 571 (1930) (closing argument by plaintiff's counsel that deceased, a mother, was irreplaceable and "more important to a family than the jury are or [the defendant] is" was not so out of line that it affected the jury's verdict).

The trial court is vested with vast amounts of discretion in the admission of evidence during the trial. Judicial discretion implies the liberty to act as a judge should act, applying the rules and analogies of the law to the facts and situations which occur prior to and during the trial. *Hurlbut v. Conoco, Inc.*, 253 Kan. 515, 529, 856 P.2d 1313 (1993). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 (1973).

A lawyer in his or her professional capacity before a tribunal shall not state or allude to any matter that the lawyer has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence. *Rood v. Kansas City Power & Light Co.* 243 Kan. 14, 21, 755 P.2d 502 (1988). A deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case. In assessing whether improper argument amounts to reversible error, great weight is given to the presence or absence of an objection and the curative effect of a well-phrased admonition to the jury. *Masson*, 7 Kan. App. 2d 344, Syl. ¶¶ 4, 6.

In *Masson*, trial counsel for the plaintiffs deliberately made the prejudicial comments before the jury. Frye concedes here there is a question of whether plaintiff's counsel asked questions to

draw out the responses but contends the question, "Why didn't you go have further medical treatment?" was designed to obtain the response given. We disagree. The fact that the plaintiff had not participated in certain therapy was brought up prior to the plaintiff testifying. In addition, there was no continued deliberate attempt to inject wealth versus poverty into the trial by plaintiff's attorney.

*Prohibiting Inquiry into McKissick's Medical Coverage*

Although Frye states plaintiff's counsel's inquiry as to plaintiff's medical coverage is an issue, it is only incidentally mentioned in her brief. "Defendant asked permission to go in to those areas [Medicare; private insurance for medical care and lost wages] and the Court denied it." No argument or citation to authority is stated by the defendant. A point incidentally raised but not argued is deemed abandoned. *Brubaker v. Branine*, 237 Kan. 488, 490, 701 P.2d 929 (1985).

The Court of Appeals determined this issue by ruling that because collateral source benefits were inadmissible, citing *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987), there was no error in the district court's refusing Frye's request to cross-examine McKissick on her insurance benefits. Frye filed a supplemental brief, claiming she should have been allowed to inquire into the insurance benefits under the doctrine of curative admissibility. The doctrine of curative admissibility allows a party to present otherwise inadmissible evidence on an evidentiary point where an opponent has "opened the door" by introducing similarly inadmissible evidence on the same point.

As authority for the doctrine, Frye cites a trio of cases from other jurisdictions: *Irick v. U.S.*, 565 A.2d 26 (D.C. 1989); *Lampkins v. United States*, 515 A.2d 428 (D.C. 1986); and *Danielson v. Hanford*, 352 N.W.2d 758 (Minn. App. 1984). *Irick*, citing *Lampkins*, notes the *sine qua non* is the introduction of inadmissible evidence. 565 A.2d at 45. Kansas courts follow the rule that if one party offers an inadmissible fact into evidence, the other party may introduce a similar inadmissible fact "whenever it is needed for removing an unfair prejudice which might oth-

erwise have ensued from the original evidence." *Dewey v. Funk*, 211 Kan. 54, 56, 505 P.2d 722 (1973). If the evidence is admissible, the doctrine of curative admissibility does not apply.

McKissick argues that the defendant's assertion of the doctrine of curative admissibility does not apply because there was no improper admission of evidence that required counteraction. McKissick asserts that even if the exclusion of evidence was error, its admission was harmless error because it would not have benefited Frye. As an example, McKissick points out the court did allow Frye to inquire into the insurance proceeds to replace McKissick's vehicle, which resulted in McKissick explaining it all went to pay off the loan balance. This statement abruptly ended further inquiry in that area by the defense.

In his opening statement, defendant's counsel made several references to the fact that plaintiff stopped seeing certain doctors and had not attempted to reduce her pain by biofeedback or a sympathetic block. The reference to McKissick's financial situation was not deliberate and was within the trial court's discretion to allow it into evidence. The facts were admissible. Even if we considered the facts to be inadmissible, the inquiry was so limited that no prejudice could have occurred. The facts of McKissick's insurance benefits were not admissible either (1) under the curative rule in *Dewey* or (2) as collateral source benefits, as the Court of Appeals ruled.

### Evidence that Defendant Spent the Night in a Motel

In his opening statement, plaintiff's counsel referred to the fact Frye, a high school senior at the time of the accident, instead of going to a senior activity day at Kansas State University, spent the night at a motel with her boyfriend. Defense counsel objected and argued that evidence was irrelevant and prejudicial. Plaintiff's counsel responded that information was relevant to show Frye was in a hurry to get her boyfriend back to school the morning of the accident. The trial judge cautioned plaintiff's counsel not to attempt to go beyond those facts to elicit sympathy from the jury.

Without citing authority, Frye asserts that although the trial court ruled this subject was irrelevant, plaintiff's attorney injected

evidence of Frye and her boyfriend's ages and where they stayed the night in an attempt to raise the sympathy of the jury and prejudice the defendant. Frye claims that this information was irrelevant and highly prejudicial, especially when coupled with McKissick's comments on McKissick's financial situation, and that all of this resulted in a verdict based on passion and prejudice. We note that in other cases this court has found error when irrelevant and prejudicial evidence was admitted at trial. See, *e.g.*, *Ayers v. Christiansen*, 222 Kan. 225, 564 P.2d 458 (1977) (introduction of evidence relating to the defendant's insurance status in regard to the issue of fault); *State v. Gregory*, 218 Kan. 180, 188, 542 P.2d 1051 (1975) (defendant's sex life or his quarrels with his paramour "wholly irrelevant" to his professed fear of knives and prejudicial); *Caylor v. Atchison, T. & S. F. Rly. Co.*, 189 Kan. 210, 368 P.2d 281 (1962) (insurance).

McKissick responds that evidence was relevant to show Frye had a motive to exceed the speed limit in hurrying to get her boyfriend back to school. McKissick notes the only other time the matter came up was when plaintiff's counsel inquired of Frye and Allen where they had stayed and at what time they had to be back. These inquiries were not objected to by Frye.

The trial judge did not rule that evidence was irrelevant but instead admonished McKissick's counsel to not use the testimony to prejudice the jury against Frye. An evidentiary ruling on relevance ordinarily rests in the sound discretion of the trial judge. K.S.A. 60-445 provides the judge may as a matter of discretion exclude evidence if the judge finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence will be offered. Frye was not surprised by the evidence. The evidence was relevant, and its admission was within the discretion of the trial judge to admit or not admit. No abuse of discretion is shown.

### Evidence of Surgical Procedure Not Performed

On redirect, plaintiff's counsel asked Dr. Hornbaker to define "sympathectomy." The doctor explained it is a medical procedure

similar to the sympathetic block except instead of injecting anesthetic the doctor makes an incision and cuts the nerve. The doctor pointed out that there is no guarantee a sympathectomy, if performed, would cure the pain and that the procedure is only done in extreme cases. Plaintiff's counsel, after introducing this evidence, attempted to continue asking questions about this treatment. Defense counsel objected, arguing that a sympathectomy was not "a recommended or discussed course of treatment." The judge overruled that objection, and then defense counsel objected on grounds it was speculative. That objection was also overruled. The doctor then testified it was a very radical form of treatment which could leave the leg somewhat numb.

Plaintiff's counsel, in examining Dr. Wright, the chiropractor who was treating the plaintiff, ascertained that the doctor was also familiar with this procedure. After Dr. Wright stated he was familiar with the procedure, plaintiff's attorney asked the doctor to describe the process. Defense counsel objected to this testimony "as not being a course of conduct recommended by this doctor and is a course of treatment he can't even do." The court overruled the objection as premature.

Plaintiff's counsel then asked Dr. Wright if he had recommended this treatment to McKissick. Defense counsel objected for lack of foundation. The judge overruled the objection. Dr. Wright described the procedure to perform a sympathectomy and stated he had not recommended it to McKissick. The doctor was then asked whether it was something that could be considered for similarly situated persons. The defense again objected, asserting the answer was speculative. The objection was overruled. Dr. Wright responded the treatment could be considered.

In his closing argument, McKissick's counsel stated, "In the more radical case they have to come into the hip, cut it open and actually cut the nerve making your leg dead. So that there's no feeling of cold, no sensation of heat. She would be carrying around a dead limb." There was no objection to these remarks in closing argument.

Frye argues it was prejudicial for the trial judge to overrule her objections and to allow McKissick to introduce testimony re-

garding a surgical procedure, sympathectomy, which was never recommended by any physician who treated McKissick. Frye admits the subject was referred to in McKissick's counsel's closing argument and acknowledges she did not object to those comments in closing argument. The Court of Appeals refused to address this issue because Frye had failed to object to the discussion of this procedure made in the plaintiff's closing argument. A point not raised before or presented to the trial court cannot be raised for the first time on appeal. *Diversified Financial Planners, Inc. v. Maderak*, 248 Kan. 946, 948, 811 P.2d 1237 (1991).

Both parties filed supplemental briefs concerning the Court of Appeals' ruling that lack of objection by Frye to the mention of the sympathectomy in closing argument precluded appellate review. To supplement her argument in this court, Frye cites McCormick on Evidence for the proposition that if an earlier objection is overruled, repeated objections are not required. McCormick states:

"A offers testimony by one witness which his adversary, B, thinks is inadmissible. B objects, and the objection is *sustained*. In such event, if A offers similar testimony by the same or another witness, B must of course repeat her objection if she is to complain of the later evidence. Suppose, however, the first objection is *overruled*. Must B then repeat her objection when other like evidence similarly objectionable is offered? A few decisions intimate that she must, a practice which places B in the invidious semblance of a contentious obstructor, and conduces to waste of time and fraying of patience. Most courts, however, hold that B is entitled to assume that the judge will continue to make the same ruling and she need not repeat the objection. It seems that the consequence of this view should be, that the first objection remains good and is not waived, and that in addition, the reach of this objection extends to all similar evidence subject to the same objection." 1 McCormick on Evidence § 52, p. 208 (4th ed. 1992).

Kansas does not follow the rule that if an earlier objection is overruled, repeated objections are not required as discussed in McCormick on Evidence. In order to raise the admissibility of evidence as an issue on appeal, the record must show a timely and specific objection. K.S.A. 60-404. If a continuing objection is lodged, failure to object when the evidence is subsequently readmitted does not bar raising the issue on appeal. See, *e.g.*, *Lytle v. Stearns*, 250 Kan. 783, 799, 830 P.2d 1197 (1992) (continuing

objection during cross-examination, no objection during subsequent discussion of evidence, objection not waived).

Frye asserts that the case of *Cooper v. Bower*, 78 Kan. 156, 96 Pac. 59 (1908), is "instructive." McKissick argues *Cooper* is not helpful. In *Cooper*, the defendant objected to a question when it was asked. The objection was overruled and the defendant's exception was noted. The witness stated, "I could state that better if I would state it just as it occurred, in my own way." The plaintiff's attorney then said, "Very well." 78 Kan. at 159. The witness then gave her answer, without a further objection, to the question asked and previously objected to.

On appeal, Cooper contended that the statement "very well" by the plaintiff's attorney constituted a new question, which was not objected to; therefore, the defendant was precluded from challenging the admission of that testimony on appeal. The *Cooper* court declined to "exact unreasonable pertinacity of counsel conducting a trial" by requiring counsel to renew objections under similar circumstances. 78 Kan. at 159. In *Cooper*, the alleged missing objection followed closely on the heels of the overruled objection.

The procedure was initially referred to by Frye's attorney during his opening argument. It was later raised by McKissick without objection. As McKissick's counsel continued asking questions about the procedure, the defense objected on a variety of grounds, all which were overruled. The defense did not request the court to note a continuing objection. In his closing argument, the procedure was discussed by plaintiff's counsel without an objection by the defense. Without a continuing objection made when the procedure was first raised by the plaintiff, on appeal Frye cannot contest the subsequent discussion of the procedure in the plaintiff's closing argument.

### Reference to Insurance During Voir Dire of the Jury Panel

During voir dire, McKissick's counsel asked if any of the prospective jurors worked in the insurance industry, either in sales or management. Two jurors replied affirmatively. The court inquired if they could still be impartial. When plaintiff's counsel

asked, "As to what you do in your business —" defense counsel interrupted and asked to approach the bench. Defense counsel moved for a mistrial because "insurance" had been "interjected" into the case. The court denied the motion for mistrial but instructed plaintiff's counsel to not proceed further into this area.

Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible as tending to prove negligence or other wrongdoing. K.S.A. 60-454. Frye contends that plaintiff's injection of insurance into the case prejudiced the jury and she is entitled to a new trial.

Although not cited by the parties 'or the Court of Appeals, this court has recognized that the questioning of jurors to determine the relationship or business background with insurance is proper. In *Mathena v. Burchett*, 189 Kan. 350, 369 P.2d 487 (1962), plaintiff brought an action for injuries suffered while a passenger in an automobile involved in an accident. During voir dire, plaintiff's attorney asked the jury panel if any of the panel had adjusted losses for either an adjusting company or insurance company or engaged in that type of work. The defendant moved for a mistrial because the plaintiff had deliberately attempted to inject insurance into the case.

The *Mathena* court observed that as far back as the turn of the century, this court has been troubled with the alleged prejudicial effect of the term "insurance" and the concurrent inference that the defendant is insured. The court observed that considerable latitude should be allowed counsel in the examination of jurors to the end that all who have any bias or prejudice, or are otherwise disqualified, may be excluded from the panel, but the inquiry should never extend so far as unnecessarily to introduce extraneous matter of prejudicial character that may improperly influence the verdict. It noted that the extent of such examination must be left largely to the sound discretion of the trial court, and unless an abuse of discretion is clearly shown, a reviewing court will not interfere. It determined there is a fine distinction between the focus of questions on voir dire that attempt to determine the relationship or business background of a

juror and those that inferentially indicate the defendant is insured. The *Mathena* court found that the questions were proper, the inquiry was made in good faith, and no showing of prejudice was reflected in the record. 189 Kan. at 352-55.

Frye contends the course of conduct engaged in by McKissick's counsel, the comment on insurance by him, and the comments challenged in the previous issues raised on appeal rose to the level of misconduct that when viewed cumulatively resulted in a biased or prejudiced verdict by the jury. McKissick counters Frye is confusing zealous advocacy with attorney misconduct. She asserts that "[a]t no place in this record could the remarks of plaintiff's counsel be read to be improper, let alone anywhere near the level of 'inherently prejudicial.' "

The Court of Appeals cited *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973), in its discussion of this issue. *Blakey* was an automobile negligence action. On appeal, defendant asserted that repeated incidents of misconduct by the plaintiff's counsel prevented a fair trial. The *Blakey* court noted that from the opening statements through the final arguments the record disclosed plaintiff's counsel personally attacked the ethics and integrity of defense counsel. Specifically, plaintiff's counsel accused defense counsel of: (1) being in bad faith; (2) trying to impeach honest answers; (3) putting words in the mouths of witnesses; (4) playing "dirty pool"; (5) beating his client and other witnesses around; (6) "sandbagging" witnesses; (7) abusing witnesses; (8) being unethical; (9) impeaching and not properly representing his client; (10) being a lawyer who had previously been admonished by the court in chambers and who during the course of the trial was in contempt of court; and (11) being heartless. Many of these remarks were repeated throughout the trial. Plaintiff's counsel, when referring to the principal defense counsel, usually did so as the "man from Salina." 213 Kan. at 94.

The *Blakey* court stated:

"Under our system of government, courts are instituted for the purpose of enforcing rights and redressing wrongs according to law. In jury trials, evidence is adduced for the purpose of ascertaining the truth, and instructions prepared by the court are given to inform a jury as to the law applicable to the facts.

Jurors should ascertain the facts from the evidence, apply the law given them to the facts as they find them, and return a verdict accordingly. Within these limits counsel may present his client's case in the light most favorable to [the client]. Constant and repeated attacks on opposing counsel, deliberately inserted in a trial to humiliate, degrade, and demean him before a jury, thwart and offend the basic purposes of a jury trial. It is the duty of the trial court to prevent such attacks in furtherance of the objects of their creation and, if made, remove their wrongful effects as far as possible. Such actions should be restrained by the trial court without the necessity of objection by offended counsel." 213 Kan. at 94.

The *Blakey* court stated the factors necessary to a fair trial are an adequate hearing before an impartial tribunal based on legally admissible evidence relevant to the issues involved, free from bias or prejudice. After carefully reviewing the record, it found the remarks and conduct of counsel materially distracted and hindered the jury from returning an impartial verdict based upon the issues between the parties and the evidence presented relevant to those issues. 213 Kan. at 96.

*Blakey* was distinguished in *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210 (1987). In *Tetuan,* the defendant culled from 6,000 pages of trial transcripts 24 alleged instances of counsel misconduct. After reviewing the allegations, this court found at best two instances rising to the level of misconduct. The court asserted that asking questions that merit a sustained objection is not in itself misconduct. 241 Kan. at 478. It stated that even if there are instances of misconduct, if they were "isolated" or are not substantially prejudicial, the verdict will be affirmed on appeal. 241 Kan. at 477. The *Tetuan* court noted that in almost all cases "prompt rulings" by the trial judge or "well-phrased admonitions" would successively remove any impact on the fairness of a trial by counsel's misconduct. 241 Kan. at 479.

In *Henderson v. Hassur*, 225 Kan. 678, 693, 594 P.2d 650 (1979), Henderson alleged that three separate comments in closing argument by Hassur's attorney constituted reversible error under the *Blakey* rule. Two of the comments were objected to and the court properly instructed the jury to disregard the statement. There was no objection to the third alleged statement. The collective judgment of this court found the three remarks did not rise to reversible error.

Frye claims there were four specific areas of alleged misconduct: the mention of insurance, the testimony regarding Mc-Kissick's claimed inability to pay for her medical expenses, references to where Frye and Allen spent the night on the evening before the accident, and testimony and comment on the medical procedure of sympathectomy, which was never prescribed or even suggested for McKissick. The Court of Appeals considered this question a "close call."

Supervision over voir dire examination of the venire and control over the nature and extent of questioning are matters necessarily left to the sound discretion of the trial court. Courts must be conscious of the rights of litigants, and improper action of their counsel should not be charged against them unless such action results in basic unfairness. Basic unfairness must be determined in the first instance by the trial court. Its decision must rest on the exercise of judicial discretion. On appeal, we must determine whether the trial court abused its discretion. In order to perform this function we must examine the alleged prejudicial material and from its nature determine whether it is so inherently prejudicial that a fair trial could not have resulted.

The insurance issue came up in voir dire and the court promptly sustained that objection. McKissick's inability to pay her medical expenses came up once during her testimony; the court overruled the objection, and no further mention of it occurred. Our analysis of those issues indicates no error occurred. Frye and Allen's whereabouts the night prior to the accident was relevant to the issue of Frye's negligence. Whether to allow the claimed repeated references to the sympathectomy procedure was discretionary with the judge. Under these circumstances, it was not a close call as to whether the defendant should have been granted a new trial or that what occurred was sufficiently similar to *Blakey* to warrant reversal.

## Was the Verdict Excessive?

Frye initially states she is seeking a remittitur. She then points out the recent case of *Dixon v. Prothro*, 251 Kan. 767, 840 P.2d 491 (1992), and notes remittitur is improper if the jury's award

is based on passion or prejudice. She then argues she is entitled to a new trial.

There are two separate types of damages, economic and noneconomic. See *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 360, 837 P.2d 330 (1992). Economic damages include the cost of medical care, past and future, and related benefits, *i.e.*, lost wages, loss of earning capacity, and other such losses. Noneconomic losses include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, and losses which cannot be easily expressed in dollars and cents. There are different standards of review employed in addressing challenges to an award of these damages.

*Pain and Suffering*

> " ' "Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence." ' " *Ratterree v. Bartlett*, 238 Kan. 11, 23, 707 P.2d 1063 (1985).

Awards for pain and suffering are overturned only if the collective conscience of the appellate court is shocked. See *Merando v. A.T. & S.F. Rly. Co.*, 232 Kan. 404, 417, 656 P.2d 154 (1982).

Frye argues the award of $65,000 for two years of pain and suffering prior to the trial, when compared to the award of $20,000 for future pain and suffering, should shock the conscience of this court. For authority she cites *Slocum v. Kansas Power & Light Co*, 190 Kan. 747, 378 P.2d 51 (1963), and *Blevins v. Weingart Truck & Tractor Service*, 186 Kan. 258, 349 P.2d 896 (1960), each of which resulted in remittiturs reducing the damage award by one-third. Frye asserts that under the circumstances in this case, it is also reasonable to reduce the amount for past pain and suffering awarded the plaintiff.

In *Slocum*, a 12-year-old boy touched a noninsulated power line carrying approximately 14,000 volts of electricity. Slocum lost his

left forearm, left hand, and the middle finger of his right hand. A doctor testified that it might be necessary to amputate Slocum's left arm in the future. Slocum also suffered large areas of scarring on his stomach and his outer and inner thighs. He spent 160 days in the hospital and endured treatment his doctor described as "among the most painful that can be endured by mankind." 190 Kan. at 753. He had established economic damages of approximately $8,500, and the jury awarded $95,000 in total damages. This court, in a 4-3 decision, affirmed the trial court's order that Slocum accept a remittitur to $60,000 or a new trial on the issue of damages.

In *Blevins*, 186 Kan. 258, the 29-year-old plaintiff was involved in an auto accident. He suffered a mild cerebral concussion, a scalp laceration, and a contusion on his left chest. Although his chest stopped hurting within 2 days, 10 days after the accident he had a 5-day attack of back pain. About six weeks after the accident, he sneezed and the back pain returned, along with pain that radiated into his groin and the back of his legs. He never sought treatment for the back pain. During this time he only missed two days of work—those immediately following the accident. He sought $50,000 in damages, received a verdict of $8,300 (of which $300 was damage to his vehicle), and agreed to a remittitur of $3,000. The defendant appealed that award of damages, but this court affirmed the trial court.

Frye cites 13 cases from other jurisdictions where appellate courts have reduced pain and suffering awards. However, there is no provision in current law for comparison of one plaintiff's recovery with another's to serve as the basis for overturning a jury's verdict. *Kuhl v. Atchison, Topeka & Santa Fe Rwy. Co.*, 250 Kan. 332, 344, 827 P.2d 1 (1992). But see *Wahwasuck v. Kansas Power & Light Co.*, 250 Kan. 606, 619, 828 P.2d 923 (1992) ("In view of the evidence, the collective conscience of this court is not shocked. Far larger damage awards have been upheld."). One of the cases Frye cites also recognizes this rule, *Engman v. City of Des Moines*, 255 Iowa 1039, 1048, 125 N.W.2d 235 (1963) ("The question of excessive damages in a personal injury case depends upon its own facts and the comparison of verdicts is of little value.").

The question of excessive verdicts for noneconomic damages has been addressed in many Kansas cases. The standard of evaluation by which an award for noneconomic damages is measured is such amount as a reasonable person estimates to be fair compensation when that amount appears to be in harmony with the evidence as arrived at without passion or prejudice. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 352-53, 789 P.2d 541 (1990), *overruled on other grounds Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991). Evaluation of the award made to McKissick must be made in light of the evidence introduced in her case.

Frye's chief complaint seems to be the disparity between the past pain and suffering and the future pain and suffering awards. At the time of the pretrial order, McKissick was seeking $150,000 for past pain and suffering and $200,000 for future pain and suffering. The trial testimony indicated the pain was much more severe during the period immediately following the accident. The award for past pain and suffering included the pain from her ankle injury as well as her other injuries. After several months of treatment, the doctors testified the plaintiff seemed to get better with the only remaining complaint being her ankle. The award does not shock the collective conscience of this court.

*Future Medical Expenses*

Frye argued in the Court of Appeals that the award of $30,000 for future medical expenses is based on passion and prejudice because it relates solely to treatment by "a chiropractor, a fellow who cannot even give pain medicine." She claimed it was "absurd" to base the amount awarded on the testimony of a chiropractor. The Court of Appeals, when reversing the jury's award for future medical expenses, opined that the testimony of the chiropractor was "pure speculation and conjecture" and was not supported by sufficient evidence. In her cross-petition for review, McKissick responds that Dr. Wright's testimony was competent evidence to support the award for future medical expenses.

In *Marcotte Realty & Auction, Inc. v. Schumacher*, 229 Kan. 252, 624 P.2d 420 (1981), this court addressed the question of

whether there was sufficient evidence to support an award of $32,000 in damages. The award was based upon a finding by the trial court that the Schumacher land could have been sold for $300 per acre if the real estate salesman had made further inquiries into the potential buyer's financial background. The testimony included that of an official of the Federal Land Bank, an official of the Farmers Home Administration, the Director of the Kansas Real Estate Commission, a real estate specialist with the Kansas Real Estate Commission, and three licensed real estate salesmen or brokers. No witness had testified as to the fair market value of the Schumacher land. There was considerable evidence of the value being between $200 and $250 per acre. The sole evidence to support the award of damages was that the potential buyer testified he would have liked to buy the Schumacher land, he could probably have gotten financial help from his father, and he thought his wife would consent to a second mortgage on their mobile home, combined with the buyer's father's testimony that if his son had wanted the Schumacher land, and if he had asked, then the father would have helped. 229 Kan. at 267.

This court noted that " '[i]t is a fundamental principle of law that recovery may not be had where it is not shown with reasonable certainty that damage was suffered.' " 229 Kan. at 267 (quoting *Apperson v. Security State Bank*, 215 Kan. 724, 735-36, 528 P.2d 1211 [1974]). It opined: "[T]he evidence falls far short of establishing with reasonable certainty that Schumacher suffered damage as a result of an act or omission to act on the part of Marcotte." 229 Kan. at 267.

In a negligence action, recovery may be had only where there is evidence showing with reasonable certainty the damage was sustained as a result of the negligence. Recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement. To warrant recovery of damages, therefore, there must be some reasonable basis for computation which will enable the trier of fact to arrive at an estimate of the amount of loss. *Cerretti*, 251 Kan. at 360-61.

Dr. Wright testified, after discussing his previous diagnosis and treatment of McKissick, that "she would have to have treatment

about once a week right up until she could either overcome that or it would gradually get worse, and we may have to slide it up where it would be a twice a week treatment program." Dr. Wright testified the cost of one visit would be $34. There was no other testimony regarding future medical needs. The jury was instructed McKissick had a life expectancy of 20 years; $30,000 divided by $34 equals 882 treatments, or 17 years of weekly visits. The jury believed Dr. Wright's testimony that McKissick needed future medical treatment for the rest of her life. The question is whether a chiropractor's testimony is sufficient to establish with a reasonable certainty that McKissick will need future medical care, which if needed will cost $30,000.

Chiropractors are licensed under the Kansas Healing Arts Act, K.S.A. 65-2801 *et seq.*, and the practice of chiropractic is recognized as one of the healing arts. *Taylor v. Maxwell*, 197 Kan. 509, 511, 419 P.2d 822 (1966). They are allowed to treat patients within the scope of specific therapies permitted by that act. See K.S.A 65-2871. In *Taylor*, one of the issues on appeal was whether a chiropractor had been qualified to testify as an expert witness. This court found no error in admitting the testimony of the chiropractor. The appellate courts are not to reweigh the testimony or pass on the credibility of witnesses. See, *e.g., Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988).

McKissick sought a total of approximately $800,000 in damages. She received about $150,000, which was reduced by the comparative fault percentage of 20%. The verdict is supported by sufficient evidence and not so excessive as to shock one's conscience. The judgment of the Court of Appeals reversing the award of $30,000 for future medical expenses is reversed; on all other issues the Court of Appeals is affirmed. The judgment of the district court is affirmed.