No. 51,338

MARCOTTE REALTY & AUCTION, INC., *Appellant,* v. MELVIN SCHU-
MACHER & SCHUMACHER BROTHERS, INC., *Appellees.*

(624 P.2d 420)

Opinion filed February 28, 1981.

*Ross J. Wichman,* of Ryan, Kent, Wichman & Walter, Chartered, of Hays, argued the cause and was on the brief for appellant.

*John T. Bird,* of Robert F. Glassman, P.A., of Hays, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by plaintiff and cross-appeal by defendants from an Ellis County District Court judgment. Plaintiff, Marcotte Realty & Auction, Inc. (Marcotte) was awarded $9,600.00 as the reasonable value of services rendered in selling 640 acres of farmland owned by the defendants Melvin Schumacher and Schumacher Brothers, Inc. (hereinafter collectively referred to as Schumacher) and Schumacher was awarded $32,000.00 upon their counterclaim, which asserted Marcotte could have sold the land for more money. The case was transferred from the Court of Appeals pursuant to K.S.A. 1980 Supp. 20-3018(*c*).

Marcotte appeals from the judgment granted Schumacher on the counterclaim and Schumacher cross-appeals from an order denying prejudgment interest on the $32,000.00 counterclaim and from an order denying Schumacher the accrued interest upon the $9,600.00 which was deposited in escrow with the clerk of the district court following the decision in the first trial of this case.

This is the second time that this case has been before this court. In *Marcotte Realty & Auction, Inc. v. Schumacher,* 225 Kan. 193, 589 P.2d 570 (1979), Marcotte sought to recover a sales commission from Schumacher but at the close of Marcotte's evidence the trial court granted judgment for Schumacher as there was no written listing contract signed by the parties as required by regulations of the Real Estate Commission. In reversing and remanding the case we held the regulation was void and Marcotte was not precluded by the oral real estate listing from recovering damages from Schumacher.

Prior to the second trial Schumacher moved to amend their pleadings to assert a counterclaim against Marcotte and the motion was granted. As our decision herein rests upon a determination of the sufficiency of the evidence, it is necessary that the relevant facts be set forth in some detail.

At the outset we pause to iterate certain well established principles of law.

"[W]hen a verdict [or judgment] is attacked for insufficiency of the evidence, 'the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below.' *Craig v. Hamilton,* 221 Kan. 311, 313, 559 P.2d 796 (1977)." *Cantrell v. R. D. Werner Co.,* 226 Kan. 681, 684, 602 P.2d 1326 (1979).

"Upon appellate review this court accepts as true the evidence, and all inferences to be drawn therefrom, which support or tend to support the findings in the trial court, and disregards any conflicting evidence or other inferences which might be drawn therefrom." *Farmers State Bank of Ingalls v. Conrardy,* 215 Kan. 334, Syl. ¶ 1, 524 P.2d 690 (1974).

With the foregoing in mind we turn to the facts as revealed by the record.

In March, 1976, Melvin Schumacher contacted Henry Marcotte, owner of Marcotte Realty & Auction, Inc., by telephone. Mr. Schumacher stated he wished to sell a section of land located in Ellis County and which belonged to the Schumacher corpora-

tion. The section contained 90 cultivated acres and 550 acres of grass. The sale price was set at $350.00 per acre. Henry Marcotte testified they agreed upon a sales commission of six percent of the sales price, although Mr. Schumacher testified it was to be five percent. Marcotte attempted to sell the real estate in the normal course of its business and was unable to do so because of the $350.00 per acre price.

At about the time that Marcotte listed the Schumacher land for sale, John Leo Hayden, Henry Marcotte's son-in-law, was employed by Marcotte as a real estate salesman. Hayden had recently passed the real estate salesman's examination and had been issued a license by the Real Estate Commission of the State of Kansas. Hayden and Henry Marcotte made several attempts, between March 1, 1976, and July 1, 1976, to sell the Schumacher property for $350.00 per acre. Henry Marcotte believed the price Schumacher was asking for the property was too high and therefore he did not make exceptional or unusual efforts to sell the property.

At trial five people who had been approached by Marcotte or Hayden about the Schumacher land testified they thought $350.00 per acre was too high a price for the land. These individuals were of the opinion the land was worth between $200.00 and $250.00 per acre, although none submitted written offers to purchase the property.

In March or April of 1976, Allen Arnhold contacted Hayden and asked about farmland which could be bought on contract. Hayden inquired of Arnhold about his financial status and was told that Arnhold owned a mortgaged double-wide mobile home on a 1.3 acre site in the country. Arnhold was an hourly-wage employee at the Travenol Laboratory in Hays and did not have any other steady source of income. He did own 40 head of cattle and he helped his father farm. Arnhold indicated he would need 100% financing since he only had a couple of thousand dollars cash. The two discussed Federal Land Bank and Farmers Home Administration loans as a possible means of obtaining 100% financing. Arnhold made no statements about any other possible source of financing.

Hayden showed Arnhold 480 acres known as the "Howerton" property which was being offered for $275.00 per acre and which was mostly cultivated land with some rough grassland. Not

completely satisfied with the Howerton property, Arnhold asked about other properties and Hayden told him about the Schumacher land and that the asking price was $350.00 per acre. Arnhold asked if Schumacher would take $300.00 per acre. Hayden claims he said, "I don't know if they [Schumacher] would or not. I wonder where we will get the financing." Hayden went on to explain that the land was priced too high to qualify for 100% financing through Farmers Home Administration and the Federal Land Bank. They then returned to a discussion of the Howerton land. Arnhold contends he made two inquiries whether Schumacher would take $300.00 and merely got a "No" answer and that he was pushed back into the Howerton property discussion. Allen Arnhold testified he was very interested in the Schumacher property but contends Hayden discouraged him from considering it.

Arnhold signed a contract, which was accepted, to purchase the Howerton property and made preliminary applications for financing to the Federal Land Bank and the Farmers Home Administration. The purchase contract was contingent upon obtaining 100% financing. The financing was available to Arnhold but Farmers Home Administration required a second mortgage on the mobile home and a contract between Arnhold and his father, Lawrence Arnhold, for the use of the latter's farm machinery. Arnhold testified that he and his wife would not agree to a second mortgage on the mobile home and that he would not agree to a written contract with his father guaranteeing him the use of the farm machinery. As a result, the loan applications were dropped and the Howerton contract fell through. Arnhold claimed at trial, however, that had he been allowed to buy the Schumacher property, which he liked much better than the Howerton property, he thought his wife would have agreed to the second mortgage and his father would probably have placed the title to the farm machinery in his name. At no time did Arnhold mention any alternative sources for financing and he did not mention his father as a possible source. He never approached his father about assisting in financing a purchase of land and did not talk to him about the requirement of Farmers Home Administration for a contract on use of the equipment.

Allen Arnhold's father, Lawrence, indicated at trial that he could have and would have helped his son with the purchase of

the Schumacher property. Lawrence testified he had the resources and the necessary inclination to assist his son in virtually any business endeavor that interested his son. However, he testified his son never asked him for help but that if he would have asked he, Lawrence, would have helped out.

None of the verbal offers made by any of the persons who had shown an interest in the Schumacher property were reduced to writing or communicated in any way by Marcotte to Schumacher. On July 1, 1976, Henry Marcotte talked to Melvin Schumacher concerning a new agreement to sell the property. Mr. Marcotte advised the asking price was too high and Mr. Schumacher agreed to reduce it to $250.00 per acre and agreed to give Marcotte an "exclusive" listing. A listing agreement was mailed by Marcotte to Schumacher which provided for a price of $250.00 per acre and a 6% commission. Schumacher never signed or returned the agreement.

Pursuant to the new agreement, Marcotte advertised the property extensively and sold it within a matter of days to GSL, Inc., for $250.00 per acre.

After the closing of the sale, Schumacher refused to pay Marcotte the 6% commission which Marcotte claimed was due under the listing agreement. Mr. Schumacher contends he understood the agreement to be that Marcotte would be allowed to keep any amount received for the property over the $250.00 per acre price, or what is commonly known as a net listing. Marcotte contended the agreement was for the standard 6% commission on the gross sales price and that Marcotte had never agreed to a net listing with any customer. Marcotte withheld $9,600.00 from the earnest money deposit and subsequently paid it into court where it has been drawing interest since 1976.

The trial court found that Marcotte was the efficient and procuring cause of the consummated sale and since there was no specific agreement as to a commission, Marcotte would be allowed compensation on the basis of the reasonable worth of the services performed. Accordingly, Marcotte was awarded $9,600.00 which was 6% of the gross sales price. In the notice of cross-appeal Schumacher originally appealed from the $9,600.00 judgment granted Marcotte but specifically abandoned that portion of the cross-appeal in the brief and at oral argument. Suffice it to say, there was more than sufficient evidence in the record to support the findings and the award to Marcotte.

The counterclaim filed by Schumacher alleged Marcotte had breached a duty owed to Schumacher by not further developing Arnhold as a purchaser and for attempting to sell the Howerton property to Arnhold while discouraging Arnhold from making an offer upon the Schumacher property. The counterclaim also alleged Marcotte was negligent in not properly supervising Hayden's actions when Marcotte knew or should have known that Hayden was an inexperienced real estate salesman. The counterclaim sought $32,000.00 actual damages based upon the difference between the $250.00 per acre sale price and the $300.00 per acre which would have been received if the property had been sold to Arnhold. Schumacher also sought punitive damages which were denied.

The trial court made extensive findings of fact, conclusions of law and specific conclusions of law and fact. Among the latter were:

"7) John Leo Hayden, through his negligence, breached a duty—an obligation which he had to the defendant by failing to make proper inquiries of the financial status of the quite-definite prospect, Allen Arnhold.

. . . .

"10) Henry Marcotte, president of the plaintiff corporation, was negligent in his failure to supervise John Leo Hayden, when he knew that John Leo Hayden was inexperienced as a salesman and unfamiliar with the persons in the surrounding area, and their financial backgrounds.

"11) The negligent failure of the plaintiff corporation through its employees to develop the prospect, Allen Arnhold, resulted in the sale of the defendant's property to a purchaser for $50 less per acre, than could have resulted.

"12) Because of this failure, the defendant, Melvin Schumacher and Schumacher Brothers, Inc., were damaged, actually damaged in the amount of $32,000."

As a result, the trial court granted Schumacher judgment for $32,000.00 on the counterclaim or a net judgment of $22,400.00 after offsetting the commission earned by Marcotte.

Numerous points are raised on appeal but the crux of the matter is whether there was any breach of duty or negligence by Marcotte which damaged Schumacher and, if so, was there sufficient competent evidence to support the determination of $32,000.00 actual damages?

Both parties rely heavily upon our decision in *Winkelman v. Allen,* 214 Kan. 22, 519 P.2d 1377 (1974). Winkelman, a real estate broker, filed an action against Allen to recover a commission on

the ground he had produced a purchaser who was ready, willing and able to purchase Allen's ranch, located in South Dakota, upon terms previously agreed upon. Allen had listed his property for sale with Winkelman who produced a party by the name of Russell Bird who was interested in the property. Bird made at least two trips to the Allen ranch and on one occasion was accompanied by his brother and father. Bird subsequently made an offer on the property which was refused by Allen, who then sold the ranch to another party. While the negotiations with Bird were pending, Allen was under the impression that Bird's father was going to be one of the purchasers and would be responsible for the payments which would be due Allen over a period of years. Russell Bird had limited financial resources while his father, Randall Bird, had extensive property holdings, farmed some 5,000 irrigated acres of land in southwest Kansas, was a stockman and owned a 2,000 head capacity feed lot. The Bird family was represented to be "one of the most prominent farming families in southwest Kansas." 214 Kan. at 24. Russell Bird made a $320,000.00 offer for the Allen property, payable $20,000.00 down with the balance being paid in cash over a period of years and by the assumption of payments upon an existing $151,000.00 mortgage. Upon the advice of his banker, Randall Bird declined to become a party to the proposed contract and did not sign the offer submitted to Allen. Allen, being of the opinion Russell Bird could not meet the terms of the contract without his father's backing, refused the offer. Allen then sold his ranch to a third party and Winkelman filed suit for a commission alleging he had produced a ready, willing and able buyer in Russell Bird. The case was tried to a jury which returned a verdict for $15,000.00 in favor of Winkelman, the broker. On appeal this court found that as a matter of law Winkelman had not produced a buyer financially qualified to handle the purchase and the decision of the trial court was reversed with directions to enter judgment for the defendant. In *Winkelman* the following rules were established:

"The term 'able' in the general rule that entitles a real estate agent or broker to a commission, if he produces a buyer who is able, ready and willing to purchase upon the proffered terms or upon terms acceptable to the principal, in the context of the rule means more than mere mental competence to make a contract or physical ability to sign it. The term 'able' refers to the financial ability of the broker-produced purchaser to complete the transaction."

"A prospective purchaser meets the legal standard of 'ready, willing and able' to

buy, although he does not have the cash in hand, if he is able to command the necessary funds to complete the purchase within the time fixed for performance."

"Where the only available source from which the greater part of the money is to come, to make the purchase of real estate possible by a broker-produced customer, is, to the knowledge of the broker, admittedly in the ownership and possession of a third person, and its use in the interest of the purchaser is subject to the gratuitous consent of such third person, who is in no way bound by or a party to the purchase agreement, such a purchaser cannot be considered one able to buy the principal's property."

"Generally speaking, a purchaser of real estate is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets—which in part may consist of the property to be purchased—and a credit rating which enable him with reasonable certainty to command the requisite funds at the required time, *or (3) if he has definitely arranged to raise the necessary money—or as much thereof as he is unable to supply personally—by obtaining a binding commitment for a loan to him for that purpose by a financially able third party.*"

"For a real estate broker to be entitled to a commission for producing a purchaser 'able, ready and willing' to purchase the property, *the broker has the obligation to inquire into the prospect's financial status and to establish his adequacy to fulfill the monetary conditions of the purchase.* With this burden cast upon the real estate broker, the owner may accept the prospective customer without being obligated to make an independent inquiry into his financial capacity, and the owner is not estopped to assert lack of financial capacity on the part of the prospective customer simply because he 'accepted' the buyer in the course of negotiations." *Winkelman v. Allen,* 214 Kan. 22, Syl. ¶ ¶ 4, 5, 6, 7 and 8. (Emphasis added.)

In the case now before the court, we are faced only indirectly with the question of whether Allen Arnhold could be considered a ready, willing and able buyer. It has been determined that Marcotte was successful in producing a buyer and entitled to a commission for doing so. The ability of Arnhold to purchase the property only becomes relevant in determining whether Marcotte breached any duty owed to Schumacher and, if so, in determining if there was sufficient evidence of Arnhold's ability to purchase the property to prove the damages awarded on the Schumacher counterclaim. In this respect, the rules laid down in *Winkelman* are pertinent to the issues before us.

The nature of the real estate broker-seller relationship is one of agency. The general rules of law applicable to principal and agent govern their rights and liabilities. *Lindsley v. Forum Restaurants, Inc.,* 3 Kan. App. 2d 489, 596 P.2d 1250, *rev. denied* 226 Kan. 792 (1979); *Patee v. Moody,* 166 Kan. 198, 199 P.2d 798 (1948). In *Merchant v. Foreman,* 182 Kan. 550, Syl. ¶ 2, 322 P.2d 740 (1958),

this court defined the broker-seller relationship as "a fiduciary one demanding conditions of trust and confidence which require of the agent the same obligation of individual service and loyalty as is imposed upon a trustee in favor of his beneficiary." As a part of the duties inherent in such a relationship, one is to keep the seller informed of information, including potential offers, which would have a bearing upon the sale of the property. Schumacher contends Marcotte breached this duty when it failed to relay the information that Arnhold might be interested at $300.00 per acre, and in failing to report the other possible offers ranging from $200.00 to $250.00 per acre. In *Graber v. Tennant*, 173 Kan. 577, Syl. ¶ 2, 250 P.2d 816 (1952) this court held that a real estate agent who is hired by a seller to find a buyer for his land, is "bound to act with utmost good faith towards him [seller] and to keep him informed of facts affecting his interests."

In the annotation "Liability of Real-Estate Broker or Agent to Principal for Concealing or Failing to Disclose Offer" 7 A.L.R.3d 693 § 6, it is stated that in some jurisdictions a broker is not ordinarily required to report offers which do not meet the terms imposed by his principal unless specifically instructed to do so. Other jurisdictions however, indicate the broker has a duty of reporting to his principal seemingly advantageous offers varying from the terms prescribed by the seller, even where the latter's conduct has indicated that such offers would be rejected. It is important to note that Marcotte did not obtain any unfair advantage or benefit from Schumacher by failing to pass on the conversation Hayden had with Arnhold. To the contrary, if a sale of the Schumacher land for $300.00 per acre could have been consummated with Arnhold, Marcotte would have been entitled to a commission of $11,520.00 as opposed to $9,600.00. Thus, it is clear that the failure to relay the Arnhold conversation to Schumacher was not done with the intent to take unfair advantage of Schumacher or for Marcotte to derive any hidden benefit.

The extent to which a broker must relay information to his principal must rest upon the facts in each particular case. If a seller states to his broker that he wants $350.00 cash per acre and will consider nothing less then there would appear to be no duty on the broker to constantly contact the seller to relay possible offers on less attractive terms. On the other hand, if the seller lists the property at $350.00 per acre but tells the broker to "see what

you can get" or "bring me an offer," or similar words indicating he is open to negotiations and wants to consider any proposal, then the broker would be under a duty to disclose any reasonable offer. In the instant case, Henry Marcotte testified the initial telephoned listing was non-exclusive, oral, at a sale price of $350.00 cash per acre, with a 6% real estate commission. This was not disputed by Mr. Schumacher except he understood the commission would be 5%. While it would have been better practice for Marcotte or its employee, Hayden, to relay the various conversations to Mr. Schumacher for his comments and reactions, the record does not support, and the court did not find, any breach of duty by Marcotte in not advising Schumacher of the conversations with prospective purchasers when the same were far from the original terms asked by Schumacher. If any of the individuals who expressed an interest in the property had executed a purchase agreement with a tender of earnest money then the failure to submit such an offer might be considered a breach of the duty owed Schumacher. However, none of them did so and under the circumstances of the original listing, we do not conclude that Hayden should have insisted upon written offers when he had no reason to believe that such would be accepted. A real estate broker is not under a duty to relay to his principal every conversation he has with possible buyers when the broker has no reasonable basis to believe such conversation, even if reduced to a written offer, would be accepted by the seller.

Interwoven with the allegation that Marcotte breached a duty to keep Schumacher informed is the finding by the trial court that Marcotte breached its duty in failing to properly develop Arnhold as a prospective purchaser. It is the position of Schumacher that Marcotte, through Henry Marcotte or Leo Hayden, or both, should have inquired further into the background of Arnhold to ascertain whether he had any third parties, more particularly his father, who might assist him in his need for financing. It is also contended that Henry Marcotte knew or should have known that Arnhold's father, Lawrence Arnhold, was probably financially capable of financing his son's desires and therefore steps should have been taken to pressure Arnhold into seeking his father's assistance.

It is no longer open to argument that one of a broker's duties is to produce a prospective buyer who is financially capable of

purchasing the listed property upon terms acceptable to the seller. In *Winkelman v. Allen,* 214 Kan. at 35, the court quoted extensively from the decision of the New Jersey Supreme Court in *Ellsworth Dobbs, Inc. v. Johnson,* 50 N.J. 528, 236 A.2d 843, 30 A.L.R.3d 1370 (1967), wherein the duties of a broker in proposing potential buyers who are financially capable of meeting the terms of the seller's agreements are dealt with at length.

How extensive is the broker's duty to delve into the personal financial status of a prospective buyer? No definite statement of that duty, which would apply to all conceivable factual situations, can be formulated. It can safely be said that a broker is required to exercise reasonable diligence and effort under the circumstances of the particular factual situation existing at the time. Did Marcotte, under the factual circumstances of this case, exercise reasonable diligence in attempting to determine and assist in Arnhold's financial ability to purchase the Schumacher land? We think so.

Keeping in mind the principles adopted in *Winkelman,* let us again turn to the testimony of Allen Arnhold and his father, Lawrence Arnhold. Allen Arnhold first approached Marcotte and talked with John Leo Hayden in late March or early April, 1976, advising that he might be interested in purchasing some farm property. He was questioned about his desires and his financial ability. He advised Hayden he had a mortgaged mobile home located upon 1.3 acres of ground, an hourly paid job with a Hays manufacturing plant, approximately 40 head of cattle located on his father's property, some minor pieces of farm equipment, a six-year-old pickup truck and perhaps $2,000.00 in savings. He advised Hayden that any purchase would require 100% financing as he did not have the finances available for a substantial down payment. Hayden indicated that under certain conditions 100% financing was available through a combined loan arrangement involving the Federal Land Bank and Farmers Home Administration. Hayden then told Arnhold about the Howerton land and it was shown to him. Arnhold was not too impressed with the property, although it appears he was advised that it would qualify for the Federal Land Bank—Farmers Home Administration 100% financing program. When Arnhold inquired about other properties, he was told the Schumacher place was for sale. They then looked at that property and Arnhold inquired whether Schu-

macher would take $300.00 per acre for it. Later Arnhold also mentioned a possible interest in the Schumacher property to Henry Marcotte and asked if he thought Schumacher would take $300.00 per acre. Arnhold contends both times he was merely told "No." Hayden contends he replied to the effect he did not know and asked how would he (Arnhold) finance it? Allegedly Arnhold replied the same as the Howerton property, that is, by Federal Land Bank and Farmers Home Administration financing. Hayden states he then told Arnhold that because of the price and the large amount of pasture as opposed to cultivated acreage, the Schumacher land would not qualify for the 100% financing program. Arnhold states he was discouraged from pursuing the possible purchase of the Schumacher land and was pushed onto the Howerton property. Arnhold signed a contract, subject to 100% financing, for the Howerton property. Hayden took Arnhold to the Farmers Home Administration office and on April 29, 1976, preliminary steps were taken to secure financing. Arnhold also made preliminary overtures to the Federal Land Bank. Arnhold was advised by Farmers Home Administration representatives that they would require a second mortgage upon his mobile home and a written agreement with his father granting Arnhold the right to use the father's farm machinery on the Howerton land. Arnhold and his wife would not agree to a second mortgage on the mobile home and he flatly refused to consider a written agreement with his father as to the use of his father's machinery. As a result the loan applications were never processed and the purchase of the Howerton property fell through. In testimony Arnhold stated he liked the Schumacher land much better and that if he had been allowed to submit an offer for it, he would have asked his father to convey all his machinery to Arnhold, although he wouldn't ask him for a written agreement for the use of the machinery. He thought his father would have transferred the farm equipment to him. He further testified that for the Schumacher property he would have been willing to execute a second mortgage on the mobile home and thought his wife would agree. Mrs. Allen Arnhold was not called to testify. In addition to his job with Travenol, Arnhold helped his father farm and was given money from time to time when his father would sell some cattle or harvest some crops. There was no specific employment arrangement between Arnhold and his father and Allen helped

out when he was needed. At no time during the negotiations and conversations with Hayden and Mr. Marcotte did Allen Arnhold ever so much as mention the fact that his father might be a source of financing although he was of the opinion that if he had asked, his father would have helped him on the financing.

Lawrence Arnhold's testimony was brief and we repeat verbatim the pertinent parts thereof:

## DIRECT EXAMINATION

BY MR. BIRD:

"Q. And, Lawrence, back in 1976, if Allen had wanted to buy the Schumacher property for $300.00 an acre, would you have been willing to help him financially on that?

(An objection to the question was interposed and overruled by the court.)

Q. Do you understand my question?

A. Yes, I would have..

. . . .

Q. Now, you know the gross sales price on 640 acres at $300.00 an acre would have been $192,000.00. Would you have been able to help your son, Allen—-

A. Yes.

Q. —to that extent?

A. Yeah.

Q. Would you have been willing to?

A. Yes.

Q. Have you told your son that?

A. He never asked, but I would have told him.

Q. Pardon?

A. I would have told him, but he never asked.

Q. He didn't ask you but you would have told him—-

A. That I would have helped him out, yes.

MR. BIRD: That is all I have."

## CROSS-EXAMINATION

BY MR. WICHMAN:

"Q. You just said on direct examination that your son Allen never asked you to finance the purchase of the Schumacher property, is that correct?

A. That is correct.

. . . .

Q. Did he ask you to use your credit or your financial ability to finance the Schumacher property?

A. No, he didn't ask but if he would have bought it, he would have asked and I would have helped him out.

. . . .

Q. Did Allen Arnhold ever come to you and ask you to sign a Farmers Home Administration form committing your machinery and equipment to Allen that he could use that machinery and equipment on the Howerton ground?

A. Well, no, he didn't ask me to sign it because he don't have to ask because it will be all his anyhow.

Q. He never did ask you to sign any of those commitments?
A. No, he didn't have to.
Q. Have you ever financed—have you financed the purchase of any real estate for anyone?
A. No."

Assuming Marcotte was aware of Lawrence Arnhold's unexpressed inclination to finance his son, we do not believe the foregoing testimony by Lawrence Arnhold meets the test of *Winkelman* that:

"Where the only available source from which the greater part of the money is to come to make the purchase possible is, to knowledge of the broker, admittedly in the ownership and possession of a third person, and its use in the interest of the purchaser is subject to the gratuitous consent of such third person who is in no way bound by or a party to the purchase agreement, such a purchaser cannot be considered one able to buy the principal's property. Such funds cannot be considered assets of the purchaser. (Citations omitted.)" 214 Kan. at 31.

The *Winkelman* court went on to state:

"In *Potter v. Ridge Realty Corporation*, 28 Conn. Supp. 304, 259 A.2d 758 (1969), the purchaser was solely dependent upon third persons who were in no way bound to furnish him funds to qualify as an able purchaser. There the court said that even if the parents of the purchaser's wife had in fact been shown to have had funds available to take over and assist in the transaction, entirely or a necessary part, the purchaser still would not qualify for the status of an 'able' purchaser within the meaning of the rule." 214 Kan. at 32.

Allen Arnhold had every opportunity to reveal to Hayden his belief that his father would take the necessary steps to assist him financially in the purchase of the Schumacher land. No such revelation was even hinted at by Arnhold. Even after he had signed a contract on the Howerton land and was advised that a farm machinery contract would be needed to obtain 100% financing through Farmers Home Administration, nothing was said to the effect that Lawrence Arnhold would transfer or give the machinery to his son. If a prospective buyer is serious in his attempts to purchase property he certainly is under some duty to reveal to the broker possible sources of financing which are peculiar to that individual and not customarily available through ordinary financing procedures. In view of the total failure of Arnhold to reveal that he had possible financial resources available through his father, we fail to find any breach of duty by Marcotte in not delving further into Arnhold's personal family affairs in an attempt to find possible sources of financing. Mar-

cotte, through its employee Hayden, used reasonable diligence in its efforts to determine the financial ability of Arnhold to purchase either the Schumacher or Howerton property.

While the foregoing disposes of the issues in the appeal, we deem it advisable to briefly address a third element of Marcotte's appeal which involves the question of whether there was sufficient evidence to support the award of $32,000.00 damages. The award was based upon a finding by the trial court that the Schumacher land could have been sold to Arnhold for $300.00 per acre if Hayden had made further inquiries into his financial background. It is interesting to note that the testimony included that of an official of the Federal Land Bank, an official of the Farmers Home Administration, the Director of the Kansas Real Estate Commission, a real estate specialist with the Kansas Real Estate Commission and three licensed real estate salesmen or brokers. No one, at any time, testified as to the fair market value of the Schumacher land. On the other hand, there was considerable evidence of the value being between $200.00 per acre and $250.00 per acre. The sole testimony to support the award of damages is that of Allen Arnhold to the effect he would have liked to buy the Schumacher land, he could probably have gotten help from his father and he thought his wife would consent to a second mortgage on the mobile home, combined with Lawrence Arnhold's testimony that if his son had wanted the Schumacher land, and if he had asked, then Lawrence would have helped.

"It is a fundamental principle of law that recovery may not be had where it is not shown with reasonable certainty that damage was suffered and that such damage resulted from the act or omission complained of. [Citations omitted.]" *Apperson v. Security State Bank,* 215 Kan. 724, 735-36, 528 P.2d 1211 (1974).

In our opinion the evidence falls far short of establishing with reasonable certainty that Schumacher suffered damage as a result of an act or omission to act on the part of Marcotte.

Giving full consideration to the law as determined in *Winkelman* and the general principles of law hereinbefore set out, a careful review of the entire record discloses as a matter of law that there is not sufficient competent evidence to establish a breach of duty owed by Marcotte to Schumacher or that Schumacher suffered damages by reason of any act or failure to act on the part of Marcotte and its employee, Hayden.

In view of the foregoing, it is unnecessary to consider the

cross-appeal of Schumacher seeking interest on the $32,000.00 judgment granted Schumacher. It is necessary to determine whether the court was correct in ordering interest on the $9,600.00 of escrowed funds to be applied to any judgment which became final in this case. The $9,600.00 came from the funds originally paid by the actual purchaser of the Schumacher land. The $9,600.00 was paid into court upon the joint agreement of the parties and invested by agreement. The judgment awarded Marcotte was based upon quantum meruit and the amount due Marcotte was not liquidated prior to a determination by the trial court of the reasonable worth of Marcotte's services. A judgment based upon quantum meruit does not draw prejudgment interest and interest on the $9,600.00 earned prior to the date of judgment in the district court should be paid to Schumacher. *Campbell-Leonard Realtors v. El Matador Apartment Co.*, 220 Kan. 659, 666, 556 P.2d 459 (1976). By the same token Marcotte is not entitled to receive double interest on the escrowed funds. All interest accrued since the date of the district court judgment should be applied first toward payment of interest on the judgment under K.S.A. 1980 Supp. 16-204 and the excess, if any, paid to Marcotte.

We hold (1) the judgment granted Marcotte against Schumacher is affirmed; (2) the judgment granted Schumacher against Marcotte is reversed and the case is remanded with directions to enter judgment for Marcotte on the counterclaim; (3) interest accrued prior to the district court judgment on the $9,600.00 placed in escrow should be paid to Schumacher; (4) interest accrued on the $9,600.00 after the date of the district court judgment shall be applied toward payment of interest on the judgment under K.S.A. 1980 Supp. 16-204 and the surplus, if any, paid to Marcotte; and (5) costs in the trial court should be assessed to the defendant, Schumacher.

The judgment of the trial court is affirmed in part, reversed in part and remanded for the entry of judgment as hereinbefore set forth.