NOT DESIGNATED FOR PUBLICATION

No. 128,017

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BRAD J. MCGIVERN,
*Appellant*,

v.

KANSAS REAL ESTATE COMMISSION,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; THOMAS G. LUEDKE, judge. Oral argument held August 5, 2025. Opinion filed May 1, 2026. Affirmed.

*R. Patrick Riordan* and *Lauren E. Bartee*, of Riordan, Fincher & Mayo, P.A., of Topeka, for appellant.

*Dwight R. Carswell*, deputy solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

BEFORE HILL, P.J., MALONE and HURST, JJ.

HURST, J.: Kansas real estate agents are expected to act in good faith for the benefit of their clients' best interests, and when they fail to adhere to those tenants the Kansas Real Estate Commission (Commission) can fine them accordingly—which is what occurred here. The Commission found that Brad J. McGivern, an experienced real estate agent, violated the Kansas Real Estate Brokers' and Salespersons' License Act (Real Estate Act), K.S.A. 58-3034 et seq., when McGivern advised a client, Drew (a pseudonym), of a listing price for their personal residence that was substantially lower than the actual market value. Not only did McGivern provide a low value, but he then

offered to buy the property based on that low price. On top of that, McGivern's purchase price also accounted for a 6 percent brokerage fee to McGivern despite McGivern also being the buyer. The day after closing on the property, McGivern turned around and listed it for sale for approximately $46,000 more than the purchase price of a day earlier.

Based on these events, Drew sought redress and after multiple proceedings, the Commission found that McGivern had violated K.S.A. 58-3062(a)(13) of the Real Estate Act by engaging in fraud or making a substantial misrepresentation and imposed a fine and assessed associated costs. McGivern appeals the Commission's findings and imposition of fees.

Despite McGivern's attempts to excuse his actions, the facts establish that the Commission did not err in finding that McGivern violated the Real Estate Act by fraudulently or substantially misrepresenting the property's value to Drew. Nor did the Commission err in assessing costs incurred from the Office of Administrative Hearings. Therefore, this case is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

McGivern has been a licensed real estate agent since 1998. In 2013, McGivern represented Drew in purchasing the residential property in Topeka (Property) for $110,000. In 2021, Drew moved in with her son at his residence and subsequently rented the Property to a friend but later decided to sell the Property. About nine years after first working with McGivern, Drew contacted him to represent her in selling the Property. Drew explained that she trusted McGivern and believed he was a good real estate agent and would secure a good price for the Property. The 2021 county appraisal for the Property estimated its value at $119,860.

2

In February 2022, McGivern met with Drew to assess the Property as Drew was trying to decide whether to invest in improvements or sell the Property "as-is." McGivern recommended selling the Property "as-is" and recommended listing the Property for $109,900, hoping it would create a bidding war that would increase the sale price to about $120,000.

Two days later, McGivern emailed Drew an Exclusive Listing Agreement. The day after sending Drew the Exclusive Listing Agreement, McGivern called her and offered to buy the Property, saying that he might use it as a rental. McGivern offered Drew $102,706 for the Property, explaining the offer was the approximate result of subtracting a 6 percent brokerage fee and a $600 transaction fee from the anticipated $109,900 listing price. Drew offered to sell the Property to McGivern for $105,000 to allow her to pay off the remainder of her car loan and become debt-free, but McGivern declined if there were no inspections of the roof and sewer line. Drew thereafter agreed to McGivern's offer. The parties executed a contract—drawn up by McGivern—for the sale of the Property for $102,706.

The sale closed on March 31, 2022. One day later, and despite making no improvements to the Property beyond possibly painting its interior, McGivern listed the Property for $149,000—nearly $40,000 more than the listing price he proposed when representing Drew, and approximately $46,000 greater than he paid for the Property the day before. Less than a week later, the Property was under contract for $139,900—$37,000 more than McGivern paid just days earlier. After expenses, McGivern made a profit of $27,762.43 on the resale of the Property.

McGivern's lender for the purchase of the Property was Capitol Federal Savings Bank. Capitol Federal's internal valuation report estimated the value of the Property to be approximately $154,900 to $162,500, depending on improvements, and noted the sale

3

price of $102,706 was well below both the market and property-tax valuations. Drew's son—with her support—filed a complaint against McGivern with the Commission alleging that McGivern "misled [Drew] on the value of her home" which "directly impacted the choice she made on how to sell her home."

Based on Drew's complaint, the Commission issued a summary proceeding order finding McGivern violated K.S.A. 58-3062(a)(13)—which prohibits licensees from engaging in fraud or making any substantial misrepresentation—and K.S.A. 58-30,113(b)(2)—which obligates a transaction broker to exercise reasonable skill and care—and fining McGivern $1,000 for each violation. McGivern sought review of the Commission's summary proceeding order. An administrative law judge with the Office of Administrative Hearings (OAH) conducted a hearing on the matter, at which Drew, her son, and McGivern testified. The ALJ issued an initial order upholding the findings and penalties for both violations.

The initial order found McGivern "did not make a market analysis or use comparable sales in the area when he determined" the $109,900 price. It referenced McGivern's testimony that "he has experience with the local market" and that "[Drew] wanted a quick sale, with the Property 'as is.'" The initial order concluded that Drew and her son contacted McGivern to be their seller's agent and believed they had hired McGivern as that, therefore McGivern had an obligation to inform Drew that his interests had changed—from helping to sell the Property to being interested in purchasing the Property. Based on these violations, the initial order found the $1,000 fines were proper.

McGivern sought review of the initial order, primarily arguing the initial order's factual findings did not support a legal finding of fraud or substantial misrepresentation under K.S.A. 58-3062(a)(13) and that McGivern did not meet the definition of a transaction broker under K.S.A. 58-30,102(u) and K.S.A. 58-30,113(b)(2). The

4

Commission issued its final order in which it partially agreed with McGivern by concluding McGivern did not qualify as a transaction broker, vacating the K.S.A. 58-30,113(b)(2) violation and its related fine. However, the Commission upheld the finding that McGivern violated K.S.A. 58-3062(a)(13). The Commission also assessed costs against McGivern in the amount of $1,339.76 for the administrative hearing.

McGivern thereafter filed a petition for reconsideration of the Commission's final order, arguing the factual findings did not support a finding that he committed fraud or made a substantial misrepresentation and that no evidence in the record supported the assessment of the costs of the administrative hearing. The Commission denied McGivern's petition for reconsideration but explained the costs it assessed against him were comprised of "costs to the OAH for the hearing in this matter, billed to the Commission in three increments of $335, $480, and $490" as well as $34.76 for mailing costs.

Pursuant to the Kansas Judicial Review Act (KJRA), McGivern filed a petition for judicial review of the Commission's final order, arguing the Commission's findings of fact did not support a violation of K.S.A. 58-3062(a)(13) based on fraud or substantial misrepresentation and no evidence supported an award of costs under K.S.A. 58-3056. McGivern relied upon K.S.A. 77-621(c)(4), (c)(7), and (c)(8) for relief.

Following briefing, the district court denied McGivern's petition, concluding the Commission's "finding of fraud or substantial misrepresentation was supported by substantial evidence considering the record as a whole" and that the Commission "did not erroneously interpret or apply the law, or act unreasonably, arbitrarily, or capriciously." The district court further determined the Commission did not err in applying the law or acting arbitrarily, unreasonably, or capriciously in assessing costs to McGivern under K.S.A. 58-3056. The court found there was a substantial basis for a finding that the

5

Commission's decision was adverse to McGivern, which supported the assessment of costs against him.

McGivern now appeals.

DISCUSSION

McGivern challenges the Commission's conclusions regarding the violation of K.S.A. 58-3062(a)(13)—based on the finding that McGivern committed fraud or made a substantial misrepresentation—and challenges the award of costs under K.S.A. 58-3056. Judicial review of the Commission's actions is governed by the KJRA. See *In re Appeal of Gates from Kansas Real Estate Comm'n*, 273 Kan. 1025, 1027, 46 P.3d 1206 (2002). This court reviews an agency's action as if the appeal was made directly to this court from the agency. *Board of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). Under the KJRA, this court may only grant relief pursuant to the statutorily enumerated grounds. See K.S.A. 77-621(c).

McGivern contends that the Commission erred in finding both a violation of the Real Estate Act and in assessing associated costs. In both instances, McGivern argues the Commission's findings violated K.S.A. 77-621(c)(7), which permits relief on appeal when an agency's decision is not supported by substantial evidence:

"(c) The court shall grant relief only if it determines any one or more of the following:
. . . .
(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act." K.S.A. 77-621(c).

6

Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 481, 509 P.3d 1211 (2022). In determining whether substantial evidence supports the Commission's conclusion, this court must "assess the evidence both supporting and contradicting the agency's findings, examine the agency's credibility determinations, and review the agency's explanation as to why the evidence sustains its findings." *Hanson v. Kansas Corp. Comm'n*, 313 Kan. 752, 763, 490 P.3d 1216 (2021). This requires a review of the record as a whole, without reweighing the evidence or engaging in de novo review. K.S.A. 77-621(d). McGivern bears the burden of establishing the invalidity of the Commission's actions. K.S.A. 77-621(a)(1).

To the extent McGivern's appeal requires this court to interpret the Real Estate Act, that is a question of law over which this court exercises unlimited review. *Bruce v. Kelly*, 316 Kan. 218, 224, 514 P.3d 1007 (2022). Likewise, this court reviews an agency's interpretation and application of the law de novo without deference to the agency's determination. *In re Tax Appeal of River Rock Energy Co.*, 313 Kan. 936, 944, 492 P.3d 1157 (2021).

I.       MCGIVERN'S VIOLATION OF THE REAL ESTATE ACT

The Real Estate Act prohibits a licensee from engaging in fraud or making any substantial misrepresentations:  "(a) No licensee, whether acting as an agent, transaction broker or a principal, shall:  . . . (13) Engage in fraud or make any substantial misrepresentation." K.S.A. 58-3062(a)(13). The Commission determined that McGivern did not qualify as a transaction broker—which is not a question on appeal. Therefore, McGivern remains subject to sanctions under K.S.A. 58-3062(a) if acting as an agent or principal in the transaction with Drew.

7

McGivern challenges whether his relationship with Drew was that of an "agent," and argues he was not subject to enforcement under K.S.A. 58-3062(a) of the Real Estate Act. Thus, before reviewing the facts supporting the Commission's violation finding, it is necessary to first determine whether McGivern acted as an agent or principal in the transaction with Drew.

*McGivern and Drew formed an agency relationship.*

The Real Estate Act prohibits any licensee, defined as "any person licensed under [the Act] as a broker or salesperson," from engaging in fraud or making a substantial misrepresentation. K.S.A. 58-3035(k); K.S.A. 58-3062(a). A "salesperson" is anyone, "other than an associate broker, who is employed by a broker or is associated with a broker as an independent contractor and participates in any activity described in subsection (f)," including the sale, exchange, purchase, or lease of real estate. K.S.A. 58-3035(o). McGivern makes offers no argument that he is not a "licensee" subject to sanctions for violations of K.S.A. 58-3062(a).

The primary question is then whether, as a licensee, McGivern was "acting as an agent . . . or a principal" in the transaction with Drew. McGivern contends that even as a licensee under the statute, he had no agency relationship with Drew because the parties failed to sign the Exclusive Listing Agreement and McGivern had "simply offered an opinion as to a competitive starting list price." That argument lacks legal and factual support and stretches the bounds of credibility. The parties did not need to execute the Exclusive Listing Agreement to establish a special fiduciary, agency relationship between McGivern and Drew. See *Hand Realty Co. v. Meyers*, 234 Kan. 304, 307, 672 P.2d 583 (1983) (finding an agency relationship may be established by implied contract in the context of real estate seller); *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, Syl. ¶ 4, 553 P.2d 254 (1976) (fiduciary relationship based on relationship between parties

8

based on equity and the nature of the relationship); *Stevens v. Jayhawk Realty Co.*, 9 Kan. App. 2d 338, Syl. ¶ 1, 677 P.2d 1019 (1984) (finding a "fiduciary relationship may exist between a prospective purchaser and a real estate agent if an express or implied contract creating an agency relationship between the two can be shown").

A real estate agent's relationship with a seller binds the agent "to act with utmost good faith towards [the seller] and to keep [the seller] informed of facts affecting [the seller's] interest." *Graber v. Tennant*, 173 Kan. 577, 581, 250 P.2d 816 (1952); see also *Marcotte Realty & Auction, Inc. v. Schumacher*, 229 Kan. 252, Syl. ¶ 5, 624 P.2d 420 (1981) (finding a fiduciary relationship of trust and confidence between a broker and seller or buyer). A fiduciary duty founded in theories of agent and principal relationships may exist between a real estate agent and their client when an express or implied contract can be shown to create such agency relationship. See *Stevens*, 9 Kan. App. 2d 338, Syl. ¶ 1 (finding fiduciary duty owed to client). Moreover, a real estate agent can be liable to their client in fraud. See 9 Kan. App. 2d 338, Syl. ¶ 5. A fiduciary is tasked "with a duty to act primarily for the benefit of another" and "exercise[s] influence over another." *Denison State Bank v. Madeira*, 230 Kan. 684, 692, 640 P.2d 1235 (1982). The existence of a fiduciary relationship "'does not depend upon some technical relation created by, or defined in, law.'" 230 Kan. at 692. Rather, it exists "in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Ford*, 220 Kan. 244, Syl. ¶ 4.

It is undisputed that:

- McGivern had been a licensed real estate agent for over 20 years with extensive experience in pricing and selling real property;
- Drew had no experience in the real estate business;

9

- Drew sought out McGivern to act as the real estate agent to sell the Property based on Drew's prior experience with McGivern she "trusted him" and believed "he would get her a good price for the Property";

- On February 6, 2022, McGivern met with Drew at the Property where they discussed Drew's desired outcome, a potential listing date of April 1, and McGivern's professional opinion regarding the listing value of Drew's home;

- Shortly after that meeting, McGivern prepared and sent Drew an Exclusive Listing Agreement for the purpose of documenting their agency relationship as real estate agent and seller; and

- McGivern called Drew after sending the Exclusive Listing Agreement to discuss its terms, and in that call McGivern suggested Drew rent the Property and thereafter offered to buy the Property.

Contrary to McGivern's arguments, the February 6 meeting was not a random conversation between acquaintances with McGivern offering personal opinions. That meeting occurred because Drew sought McGivern's professional assistance to sell the Property, and two days later McGivern emailed Drew an Exclusive Listing Agreement that outlined their professional, agency relationship. The parties clearly intended to create an agency relationship with McGivern acting as Drew's real estate agent for the sale of the Property. See *Nordstrom v. Miller*, 227 Kan. 59, 63, 605 P.2d 545 (1980) (defining an agency relationship as that between a principal and a real estate broker). Only because McGivern offered to purchase the Property did they fail to execute the Exclusive Listing Agreement. Despite the failure to execute the Exclusive Listing Agreement, McGivern and Drew formed an agency relationship for the purpose of McGivern acting as the real estate agent to sell the Property. Therefore, McGivern is subject to sanctions under K.S.A. 58-3062(a) related to the transaction. See *Ford*, 220 Kan. 244, Syl. ¶ 4; *Stevens*, 9 Kan. App. 2d 338, Syl. ¶ 1.

*Substantial competent evidence supports the Commission's finding.*

Next, this court must determine whether substantial, competent evidence supports the Commission's finding that McGivern engaged in fraud or made a substantial misrepresentation in violation of K.S.A. 58-3062(a). To establish actionable fraud, a party must show that another intentionally made false statements knowing the statements were false or made them recklessly without actual knowledge of their veracity, for the purpose of inducing the party to rely on and act upon the statements. The party must then reasonably rely on those false statements and suffer damages. *Kelly v. VinZant*, 287 Kan. 509, 515, 197 P.3d 803 (2008). The Real Estate Act does not define "substantial misrepresentation," nor is it defined in other relevant contexts. While a finding of either type of violation will suffice, the Commission and this court focus on substantial misrepresentation.

McGivern argues that substantial misrepresentation is the same as fraudulent misrepresentation, which, under Kansas law, is when a party knowingly, or with reckless disregard for the truth, makes an untrue statement or omits a material fact with the intent to deceive, and another party justifiably relies on the statement and suffers damages. See *Chism v. Protective Life Ins. Co.*, 290 Kan. 645, 654, 234 P.3d 780 (2010) (outlining the elements in the insurance context). The definition of fraudulent misrepresentation is exceedingly similar to the definition of fraud, making them non-distinct causes of action. See *Galindo v. Taylor*, No. 22-2414-DDC, 2025 WL 2306216, at *19 (D. Kan. 2025) (unpublished opinion) ("'the elements for fraudulent misrepresentation and fraud [under Kansas law] parallel one another'"). Therefore, McGivern's argument is unavailing. The Real Estate Act prohibits both fraud and substantial misrepresentation, which demonstrates an intent to prohibit two distinct types of behavior, not to merely prohibit fraud described in two different ways.

11

The Commission maintains that substantial misrepresentation is more akin to negligent misrepresentation, which occurs when someone, in the course of their employment or when they otherwise have a pecuniary interest, "'supplies false information for the guidance of others'" when that person "'fails to exercise reasonable care or competence in obtaining or communicating the information.'" *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604, 876 P.2d 609 (1994) (quoting the Restatement [Second] of Torts § 552 [1976]). Although the Commission at least contends that there are two distinct prohibited types of behavior, its argument is also unavailing. Nothing in the prohibition demonstrates an intent to prohibit merely negligent conduct. The Legislature's use of the word misrepresentation carries with it an intent to punish something more than mere negligence, which can occur from carelessness. See, e.g., *In re Pyle*, 283 Kan. 807, 827, 156 P.3d 1231 (finding no violation of a rule prohibiting misrepresentation when the court found "mistake rather than malevolence").

If a statute's language is plain and unambiguous, this court will not speculate about what the Legislature intended or "read into the statute something that is not readily found in it." *Hays v. Ruther*, 298 Kan. 402, 405, 313 P.3d 782 (2013). The Legislature knows how to "express[] its intent through the language of the statutory scheme" and appellate courts presume as much when analyzing statutory language. 298 Kan. at 405. This court's reading of a statute begins with its plain language, giving common words their ordinary meaning. *Bruce*, 316 Kan. at 224.

Therefore, this court must determine the meaning of substantial misrepresentation in K.S.A. 58-3062(a)(13). The Kansas Supreme Court has cited to a definition of misrepresentation as "the 'act . . . of making a false or misleading assertion about something, usu. with the intent to deceive.'" *In re Morton*, 317 Kan. 724, 748-49, 538 P.3d 1073 (2023) (quoting Black's Law Dictionary 1198 [11th ed. 2019]). In evaluating the meaning of the word "substantial," the Kansas Supreme Court has recognized a

12

definition from Black's Law Dictionary as "[o]f real worth and importance; of considerable value; valuable. Belonging to substance; actually existing; real; not seeming or imaginary; not illusive; solid; true; veritable. . . . Something worthwhile as distinguished from something without value or merely nominal. . . . Synonymous with material." *Pipe v. Hamilton*, 274 Kan. 905, 911, 56 P.3d 823 (2002) (quoting Black's Law Dictionary 1428 [6th ed. 1990]). Additionally, the court cited pattern jury instructions that defined "substantial chance" as "'one which is capable of being estimated, weighed, judged, or recognized by a reasonable mind.'" 274 Kan. at 911. Black's Law Dictionary equated "substantial" with "material," and the court has defined a "material representation" as one that "relates to some matter that is so substantial as to influence the party to whom it is made." *Stechschulte v. Jennings*, 297 Kan. 2, 19-20, 298 P.3d 1083 (2013).

Taking these definitions together, the phrase "substantial misrepresentation" as used in the Real Estate Act refers to an untrue, false, or misleading assertion about something material that the speaker either knows to be untrue or shows a disregard for its truthfulness. Unlike in a fraud claim, to establish a "substantial misrepresentation" in this context, there is no need to show that the speaker intended to deceive the listener. Additionally, while demonstrating fraud or fraudulent misrepresentation "'requires proof that the defendant knew the statement was untrue or was reckless as to whether the statement was true or false,'" negligent misrepresentation "'merely requires proof that the defendant failed to exercise reasonable care or competence to obtain or communicate true information.'" *Gerhardt v. Harris*, 261 Kan. 1007, 1018, 934 P.2d 976 (1997). Thus, because "substantial misrepresentation" does not require the same mens rea as fraud, and the Legislature did not include negligence as a violation of K.S.A. 58-3062(a)(13), the mental culpability required to establish "substantial misrepresentation" is something less than a reckless disregard for the truth and something more than a failure to use reasonable care or competence regarding the truth.

Here, McGivern advised Drew to list the Property at $109,900 with the hope that a bidding war would drive the price up to about $120,000. Despite having been a real estate agent for more than 20 years, McGivern did not conduct a market analysis or refer to comparable sales in the area to determine an appropriate listing price. At the time McGivern gave this professional advice about the listing price, the county appraisal was almost $120,000. Although McGivern testified that Drew knew the county appraisal, both Drew and her son testified that McGivern never discussed the county appraisal with them. Additionally, as an experienced real estate agent, McGivern should have known the new county appraisals would be complete within a few weeks and that the county appraised value would likely have increased. In fact, McGivern testified property inventory was low at that time and another broker testified that the spring of 2022 was a hectic market for sellers with low inventory driving prices up.

McGivern called Drew the day after emailing the Exclusive Listing Agreement and offered to buy the Property for $102,900, explaining the reduction from $109,900 as a reflection of the estimated 6 percent brokerage fee and $600 transaction fee. McGivern also represented that he wanted to use the Property as a rental. After some negotiation, Drew—who had no experience in pricing real estate—eventually agreed to sell the Property to McGivern for $102,900. Approximately six weeks later—and one day after McGivern closed on the purchase of the Property—McGivern listed the Property for sale for $149,000.

McGivern attempts to dismiss this unfortunate set of facts by explaining the reasonableness of each step in isolation. First, McGivern contends that the low listing price proposed was based on the condition of the Property when he toured it, which was being used as a rental and was dirty, and was also intended to elicit multiple offers. Contrary to McGivern's arguments, this explanation demonstrates that McGivern knew the Property's value was higher than the $109,900 he suggested as the listing price.

14

McGivern knew that the renter would vacate and the Property could be cleaned up before listing. It was clearly in a more suitable condition just six weeks after McGivern suggested the low list price, as evidenced by the $40,000 increased listing price the day after McGivern purchased the Property, despite no evidence of investment in the Property aside from possibly new interior paint. Second, McGivern contends that after he offered to purchase the Property, Drew was free to negotiate with McGivern for a better purchase price, or to consult a different agent regarding value or even list the Property with a different agent. However, McGivern never notified Drew of those options. Although McGivern apparently believed that once he offered to purchase the Property he was not Drew's agent and owed no duty to act on Drew's behalf, McGivern never told Drew of that shift in the relationship.

There is no doubt that, while acting as Drew's agent, McGivern made a substantial misrepresentation—a false or misleading assertion about something material or of importance—related to the Property's value. There is no need to find this substantial misrepresentation intentional, and it is clearly more than merely negligent. The price McGivern told Drew at which they should list the Property was not based on the available county appraisal, was not the result of comparable sales, and did not involve any market analysis. It also did not account for the low inventory or the upcoming busier spring real estate season. Despite McGivern offering a free comparative market analysis as described on his professional website, McGivern did not provide that service to Drew. As the district court observed in declaring its skepticism of McGivern's supposed lack of awareness of the value of the Property, McGivern's "failure to pursue information that he knew was readily available, and would likely result in a much higher value, is evidence of willful ignorance and reckless disregard for the truth."

Moreover, McGivern's other conduct exacerbated his substantial misrepresentation about the Property's value and negates any contention that the action was merely

15

negligent. McGivern's suggestion that he would use the Property as a rental—while failing to mention any potential to flip the Property—hid the Property's potential value as a quick flip. Additionally, McGivern's failure to notify Drew that once he offered to buy the Property he was no longer acting for her benefit or that Drew should seek independent professional advice demonstrates that McGivern's misstatement about the Property's value was not merely negligent. While McGivern may contend such things were obvious or irrelevant, at oral argument McGivern admitted that he and Drew did not have equal bargaining position. McGivern offered to purchase the Property in the same conversation that began with checking to see if Drew had received the Exclusive Listing Agreement in which the parties identified McGivern as Drew's agent—this exchange lacks indicia of an arm's-length negotiation.

McGivern maintains that he was clear about his role as buyer; his comments about renting the Property were merely "ambiguous statement[s] of future intent" and he was free to change his mind; and that he "simply offered an opinion as to a competitive starting list price" for the Property. McGivern's focus on each action in isolation fails to put these events in the context of the agency relationship and minimizes the impact of each action relative to the others. McGivern wants this court to view this situation as an arm's-length negotiation between equals, despite McGivern's admission that they did not have equal bargaining power. In just one day of owning the Property, McGivern realized about $27,000 in profit. Not only did McGivern benefit from immediately flipping the Property for a profit, he also received a 6 percent brokerage fee and a $600 transaction fee from purchasing the Property. McGivern used his dual role as agent and buyer to substantially misrepresent the Property's sale value to his benefit and Drew's detriment. The Commission's determination that McGivern made a substantial misrepresentation in violation of K.S.A. 58-3062(a)(13) is based on substantial evidence, and the district court did not err in affirming the Commission.

16

## II. THE COMMISSION'S COST ASSESSMENT

The Commission's final order assessed McGivern $1,339.76 in costs for the administrative hearing from McGivern's appeal of the Commission's decision. Those costs comprised "costs to the OAH for the hearing . . . billed to the Commission in three increments of $335, $480, and $490," as well as $34.76 for mailing costs. While McGivern seeks relief under K.S.A. 77-621(c)(7) alleging that the Commission's decision to assess the OAH costs was not based on substantial evidence, McGivern maintains the Commission erroneously interpreted the Real Estate Act, which triggers review under K.S.A. 77-621(c)(4). Specifically, McGivern argues there was no statutory basis upon which the Commission could rely to assess the OAH hearing costs to him. Although McGivern cited the wrong statute on appeal, he raised the issue to the district court under K.S.A. 77-621(c)(4). Thus, given that this court reviews the agency decision, the issue is reviewed under the standard imposed by K.S.A. 77-621(c)(4). See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, Syl. ¶ 11, 204 P.3d 562 (2009) ("failure to raise an issue at administrative hearing bars a district court only from reviewing that particular issue"). Judicial review under K.S.A. 77-621(c)(4) is unlimited without deference to the agency's view. *In re Tax Appeal of River Rock Energy Co.*, 313 Kan. at 944.

The Commission relied on K.S.A. 58-3056 to assess "[c]osts for the OAH hearing." K.S.A. 58-3056 provides that "[t]he costs of any hearing before the commission may be assessed against the licensee or applicant if the order of the commission is adverse to the licensee or applicant." K.S.A. 58-3056. The statute further provides:

> "Costs shall include:
> "(a) Statutory fees and mileage of witnesses attending a hearing or for the taking of depositions used as evidence;
> "(b) reporter's or stenographic charges for the taking of depositions used as evidence or for transcripts of the hearing;

17

"(c) expenses for audits, appraisals, surveys and title examinations; and

"(d) such other charges authorized to be taxed as costs, as specified by K.S.A. 60-2003 and amendments thereto." K.S.A. 58-3056.

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *Johnson v. U.S. Food Service*, 312 Kan. 597, 600, 478 P.3d 776 (2021). An appellate court must first attempt to glean legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Bruce*, 316 Kan. at 224. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Schmidt v. Trademark, Inc.*, 315 Kan. 196, 200, 506 P.3d 267 (2022). Where there is no ambiguity, the court does not need to resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. *In re Joint Application of Westar Energy and Kansas Gas and Electric Co.*, 311 Kan. 320, 328, 460 P.3d 821 (2020).

While McGivern is correct that the Real Estate Act does not specifically include costs from a hearing conducted by the OAH, its plain and unambiguous language expressly provides that the Commission has the authority to assess against licensees "[t]he costs of any hearing before the commission . . . if the order of the commission is adverse to the licensee or applicant." K.S.A. 58-3056. The Commission's order is undoubtedly adverse to McGivern. The first question is whether the provision identifying that "[c]osts shall include" is a limiting provision meaning that unidentified costs cannot be assessed. If not a limiting provision, then the second question is whether the costs from the OAH constitutes "costs of any hearing before the commission." K.S.A. 58-3056.

18

As to the first question, whether the statute's list of enumerated costs means that other, unidentified costs are excluded—whether that list is exclusive—is an issue of legislative intent. On one hand, it seems the Legislature would not have bothered defining what costs shall be included unless it intended for the list to be exhaustive. One primary reason the Legislature would have taken time to identify specific costs to be included is to exclude those costs not included. See *Towne v. U.S.D. No. 259*, 318 Kan. 1, 9, 540 P.3d 1014 (2024) ("[T]he maxim of *expressio unius est exclusio alterius*—i.e., the inclusion of one thing implies the exclusion of another—demonstrates that this omission was intentional."). However, the statute at issue in *Towne* did not begin with an opening, broad inclusive phrase like the one here, which permits the Commission to assess "[t]he costs of any hearing before the commission." K.S.A. 58-3056.

Additionally, the Legislature used the phrase "shall include," which is inclusive, rather than a more limiting phrase such as "shall mean" or "includes only," both of which would limit the scope of the provision only to those costs expressly enumerated. See, e.g., *State v. Jefferson*, 287 Kan. 28, 37-38, 194 P.3d 557 (2008) (noting that "includes only" would be limiting language); *Peterson v. City of Minneapolis*, 878 N.W.2d 521, 524 (Minn. Ct. App. 2016) ("[W]e will not apply [the canon of *expressio unius est exclusio alterius*] here because of the introductory word, 'including,' which by definition is not exclusive."); *National Railroad Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 6:16-cv-01094-JTM, 2017 WL 1175432, at *3 (D. Kan. 2017) (unpublished opinion) (finding use of "shall include" in K.S.A. 66-105 was inclusive rather than exclusive, which would have required language like "means the following" or "only").

Even if this court finds the list in K.S.A. 58-3056 is inclusive—encompassing administrative hearing fees—there remains the second question of whether the OAH hearing was "before the commission" as contemplated by the statute when the "commission" is simply defined as the "Kansas real estate commission." K.S.A. 58-

19

3035(g). McGivern argues that by holding the hearing before the OAH, the proceeding was thus not "before" the Commission. However, using McGivern's logic would mean that the hearing was "before" the OAH—but the OAH does not act independently to impose sanctions on individuals that would result in hearings "before" it. Rather, it acts on behalf of state agencies. K.S.A. 75-37,121(b). In interpreting the Legislature's intent, it is necessary to review the purpose of the OAH.

The OAH is part of the Department of Administration, originally created to conduct administrative proceedings for the State's human service agency and authorized to conduct adjudicative hearings for other government agencies. See Asimow, News from the States, Admin. & Reg. L. News, Winter 1999, at 7; see also K.S.A. 75-37,121(a) ("There is created the office of administrative hearings within the department of administration, to be headed by a director appointed by the secretary of administration."); *Price v. Kansas Dept. of SRS*, 39 Kan. App. 2d 86, 88, 176 P.3d 1002 (2008) (noting that an OAH hearing officer is not from within the agency whose action is being reviewed). The Commission conducts disciplinary proceedings in accordance with the Kansas Administrative Procedure Act (KAPA). K.S.A. 58-3050(i); K.S.A. 77-562. As of July 1, 2009, the OAH serves as a central hearing panel for "all other Kansas administrative act hearings" not specifically identified in the statute, and such agencies shall use the OAH for adjudicative proceedings in which the agency or members are not the presiding officer. K.S.A. 75-37,121(h)(5). This includes adjudicative hearings for the Commission.

Therefore, under McGivern's reading of the statute, the Commission is simultaneously directed to use the OAH for adjudicative hearings and prohibited from assessing costs against licensees when it uses the OAH. That would create an absurd result inconsistent with other agencies' utilization of the OAH and related cost assessments. For example, similar licensing boards assess costs from the OAH against licensees. See K.S.A. 65-1956 (the Board of Cosmetology may recover costs from

20

adjudicative hearings before the OAH); K.S.A. 40-2,137 (permitting presiding officer fees from external administrative hearings in insurance proceedings).

The Legislature's intent, as demonstrated through the common, ordinary meaning of the words, when considering the KAPA's purpose and process, is that the phrase "hearing before the commission" in K.S.A. 58-3056 means a hearing requested through the Commission or from which the Commission will issue an order. This meaning is consistent with a reading of the entire provision, which provides that the costs may be assessed "*if the order of the commission* is adverse to the licensee or applicant." (Emphasis added.) The finding, regardless of the entity conducting the hearing, comes from the Commission and thus the issue is decided before the Commission.

CONCLUSION

After establishing an agent relationship with Drew, McGivern advised her that the listing value of the Property was far lower than its true value without reviewing any comparable sales or conducting any market analysis. McGivern's conduct, including offering to purchase the Property to use as a rental investment for an even lower price without advising Drew to seek professional advice and then immediately flipping the Property for a tidy profit with little investment, supports the Commission's conclusion that McGivern's advice was not a mere error or oversight but a substantial misrepresentation in violation of K.S.A. 58-3062(a)(13). Thus, the Commission's finding that McGivern violated K.S.A. 58-3062(a)(13) is affirmed, as is the assessment of OAH costs.

Affirmed.

21